The STATE of Ohio, Appellant,

v.

WHITE et al., Appellees.

[Cite as State v. White, 175 Ohio App.3d 302, 2008-Ohio-657.]

Court of Appeals of Ohio,
Ninth District, Summit County.

No. 23522.

Decided Feb. 20, 2008.

304

Sherri Bevan Walsh, Summit County Prosecuting Attorney, and Richard S. Kasay, Assistant Prosecuting Attorney, for appellant.

Lawrence L. Delino and Jill Fankhauser, for appellees.

DICKINSON, Judge.

## INTRODUCTION

{¶ 1} Steven Barrett and Cynthia White were arrested and charged in connection with a methamphetamine laboratory located inside White's residence in Stow. Police conducted a warrantless search of Barrett's vehicle and, partially through the use of a canine sniff of the vehicle, discovered evidence of chemicals used in the production of methamphetamine. Police later conducted a warrantless entry and protective sweep of White's home, where additional physical evidence was discovered. Barrett moved the trial court to suppress the physical

evidence found in his vehicle, as well as physical evidence found in White's home. Barrett also moved the court to suppress a statement that he made at the scene of the traffic stop. White moved the court to suppress only the physical evidence found inside her home. The trial court granted the suppression motions.

{¶ 2} This court reverses and remands, because the traffic stop and search of the car were properly conducted and did not violate Barrett's Fourth Amendment rights. Therefore, the physical evidence found in that search should not have been suppressed. Barrett's statement that there might be a methamphetamine laboratory at White's house should not have been suppressed, because although custodial, it was made voluntarily and not in response to any question or statement from police officers. The physical evidence recovered from White's residence should not have been suppressed, because the officers' warrantless entry was legal under the emergency-aid exception to the warrant requirement. Although the ensuing protective sweep was illegal, the items discovered during that initial search inevitably would have been found during the subsequent legal search supported by the search warrant.

## FACTS

{¶ 3} The record indicates that on August 3, 2006, an unidentified individual walked into the Stow Police Department and told Detective Thomas Gottas that White was operating a methamphetamine laboratory at her house in Stow. This was not the first time that the Stow Police Department had heard that White was running a methamphetamine laboratory. The previous year, Detective Gottas had received a similar report from a trusted confidential informant. The officer had also heard that same information from an unknown caller on an anonymous drug-tip line.

{¶ 4} The unidentified individual who came into the Police Department in August 2006 had not been previously known to the Stow Police. This confidential informant agreed to wear a wire and enter White's house in an effort to further the police investigation. That same day, while police were watching White's residence, Barrett pulled into the driveway in his Cavalier. After a discussion, monitored by police, regarding who would go and purchase iodine, Barrett left the house with the confidential informant in a Buick that had been there before Barrett's arrival. The confidential informant purchased a three-pound tub of iodine crystals and asked to be dropped off. Detective Gottas called a canine-unit patrol officer and asked him to monitor Barrett's vehicle.

{¶ 5} Officer Bell, the canine handler, testified that as he watched the Buick, he used a radar gun to confirm that the vehicle was speeding. He pulled the car over and, while running a check on the driver, walked his drug-sniffing dog around the car. The dog alerted on the trunk. No drugs were found in the

trunk, but Officer Bell did find empty containers of acetone and naphtha. Both of these chemicals are used by painters as cleaning agents. They are also used in the production of methamphetamine. In addition to the empty containers, the car contained the three-pound tub of iodine crystals purchased by the confidential informant. Iodine crystals are also used in the production of methamphetamine.

{¶ 6} While Officer Bell was searching the vehicle, Detective Gottas and his partner approached and began questioning Barrett. The detectives told Barrett that they believed there was a methamphetamine laboratory at White's residence. Barrett admitted that White was his ex-girlfriend and that he used to live with her at that address. He also reported that he had spent the previous night at her residence. The officers testified that both the Buick that Barrett was driving that afternoon and the Cavalier he had driven to the White residence were registered in his name.

{¶ 7} Officer Bell and Detective Gottas testified that Barrett was not free to leave the scene of the traffic stop while he was being questioned, despite the fact that he was not arrested until the questioning concluded. Officer Bell testified that he did not issue a warning citation to Barrett for the speeding violation until after the arrest. According to Detective Gottas, after Barrett was handcuffed and was being led to the police cruiser, he spontaneously said that he thought there might be a methamphetamine lab at White's house. Detective Gottas testified that this statement was made spontaneously and not in response to any question. Detective Gottas also testified that Barrett was not warned of his right against self-incrimination at any point during the roadside interrogation.

{¶ 8} Following the arrest of Barrett, the officers went directly to White's house. Detective Gottas testified that they intended to do a "knock and talk" in order to "further probable cause" for a search warrant. The officers knocked on the back door for several minutes and received no response. The officers could see White going from the first floor down into the basement. At that point, the officers continued to knock and announced their identity as police officers, ordering White to come to the door. Several minutes later, the officers saw White running from the basement to the upstairs and then heard glass breaking on the second floor. At that point, the officers "believed that there was a meth lab in that house and * * * broke the door down [and] went inside."

{¶ 9} Following the sound of breaking glass, the officers ran upstairs. They secured White in an upstairs bedroom while other officers went down into the basement to look for people who might have been hiding. The officers did not find anyone else in the house. Officers briefly entered every room, then secured the perimeter while detectives went to get a search warrant. Execution of that warrant produced various items, such as glassware and chemicals used in the production of methamphetamine, but no drugs were found inside the home.

Detective Gottas testified that the entry was made without a search warrant because they believed that there was a methamphetamine laboratory inside the home and that White was attempting to destroy the evidence. Officer Gottas added that they were concerned for the safety of the neighborhood due to the operation of the suspected laboratory and the additional threat created by the rapid dismantling of it.

{¶ 10} White was charged with illegal manufacture of drugs, endangering children, and tampering with evidence. Barrett was charged with illegal manufacture of drugs and illegal assembly or possession of chemicals for the manufacture of drugs. The trial court granted the defendants' motions to suppress. The contested evidence included physical evidence found inside White's residence and inside the car, as well as statements made by Barrett during the traffic stop. The trial court determined that following the roadside questioning of Barrett, the officers had probable cause to obtain a search warrant of White's residence. The trial court held the warrantless search of White's residence illegal, because any exigency that may have existed during the "knock and talk" was created by the officers. The trial court also suppressed the statements made by Barrett during the traffic stop, because he was in custody, yet never warned of his rights, while being questioned. The state has appealed the trial court's ruling suppressing this evidence.

## STANDARD OF REVIEW

{¶ 11} A motion to suppress presents a mixed question of law and fact:

When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. * * * Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.

*State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, at ¶ 8; but see *State v. Metcalf*, 9th Dist. No. 23600, 2007-Ohio-4001, 2007 WL 2255241, at ¶ 14 (Dickinson, J., concurring).

## THE TRAFFIC STOP

{¶ 12} An officer may properly conduct a traffic stop "based upon a reasonable suspicion that a motorist was violating a traffic law." *State v. Poole* (June 7, 1995), 9th Dist. No. 2336–M, 1995 WL 338477, at *3, citing *State v. Carlson* (1995), 102 Ohio App.3d 585, 593, 657 N.E.2d 591. The detention, however, may not last any longer than is "necessary to effectuate the purpose of the stop."

*Florida v. Royer* (1983), 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229. The officer may not continue the detention for reasons unrelated to the initial purpose of the stop, unless he discovers additional specific and articulable facts that give rise to a reasonable suspicion of criminal activity. *State v. Robinette* (1997), 80 Ohio St.3d 234, 685 N.E.2d 762, paragraph one of the syllabus; *State v. Shook* (June 15, 1994), 9th Dist. No. 93CA005716, 1994 WL 263194, at *3.

## CUSTODIAL INTERROGATION

{¶ 13} Certain procedural safeguards have been put in place to protect the Fifth Amendment right against compelled self-incrimination. *Miranda v. Arizona* (1966), 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694. The prosecution will not be permitted to use any statements that result from custodial interrogation before the defendant was "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney * * * ." Id. Whether the questioning occurred while the suspect was "in custody" for *Miranda* purposes is determined by considering "how a reasonable man in the suspect's position would have understood his situation." *State v. Farris,* 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985, at ¶ 14, quoting *Berkemer v. McCarty* (1984), 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317. If the reasonable suspect would have believed that he was not free to leave during the questioning, then the interrogation was custodial in nature, and any statements elicited in response to it, before *Miranda* warnings were given, will not be admissible against the speaker at trial. Statements will not be excluded under these circumstances, however, unless they are made in response to a statement, question, or remark that a police officer " ' "should know [is] reasonably likely to elicit an incriminating response.' " *State v. Tucker* (1998), 81 Ohio St.3d 431, 436, 692 N.E.2d 171, quoting *Rhode Island v. Innis* (1980), 446 U.S. 291, 300–301, 100 S.Ct. 1682, 64 L.Ed.2d 297. " 'Any statement given freely and voluntarily without any compelling influences is * * * admissible.' " Id., quoting *Innis,* 446 U.S. at 299–300, 100 S.Ct. 1682, 64 L.Ed.2d 297, quoting *Miranda v. Arizona* (1966), 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694.

{¶ 14} Officer Bell testified that he used his radar to confirm his suspicion that Barrett was speeding. This evidence was not contradicted by Barrett. Officer Bell properly initiated the traffic stop on the basis of Barrett's traffic violation. The state has contested the trial court's suppression of Barrett's statement that there might be a methamphetamine laboratory at White's residence. This statement was made after Barrett had been arrested, but before he was given *Miranda* warnings. Detective Gottas testified that Barrett was wearing handcuffs and walking toward the police cruiser when he voluntarily

made the statement. Detective Gottas testified that Barrett made this statement spontaneously and not in response to a question or statement from any officer. In this case, the only evidence offered at the suppression hearing came from three police officers. Barrett did not contradict their testimony, and the trial court did not find that the officers were being untruthful. Therefore, the trial court erred in suppressing Barrett's statement that there might be a methamphetamine laboratory at White's house because, although custodial, it was made voluntarily and not in response to any question or statement from the officers. To the extent that the state's assignment of error relates to Barrett's statement that there might be a methamphetamine laboratory at White's residence, it is sustained.

## THE DOG SNIFF

{¶ 15} It appears from the journal entry that Barrett's motion was granted in full; therefore, this court will also address the suppression of the physical evidence taken from the car. An officer may extend a roadside detention beyond the bounds of the typical traffic stop if he discovers additional specific and articulable facts that give rise to a reasonable suspicion of criminal activity unconnected with the initial reason for the stop. *State v. Shook* (June 15, 1994), 9th Dist. No. 93CA005716, 1994 WL 263194, at *3. While a vehicle is lawfully detained, an officer may conduct a dog sniff of the exterior of the vehicle regardless of whether he has a reasonable suspicion of drug-related activity. *State v. Carlson* (1995), 102 Ohio App.3d 585, 594, 657 N.E.2d 591. If a properly trained dog alerts on a vehicle from the outside, the officer has probable cause to search, at a minimum, the area of the vehicle near where the dog alerted. Id. at 601, 657 N.E.2d 591, citing *United States v. Seals* (C.A.5, 1993), 987 F.2d 1102, 1106–1107.

{¶ 16} Officer Bell legally initiated the traffic stop in this case based upon Barrett's violation of the speed limit. Officer Bell promptly conducted a dog sniff of the exterior of the vehicle while Barrett's license and registration were being checked by computer. Once the dog alerted to the trunk, Officer Bell had probable cause to open the trunk and search it. Detectives Gottas and Scalise testified that they approached Barrett and began questioning him when the dog alerted on his trunk. Although no drugs were found in the trunk, the officers found acetone and naphtha containers. Barrett claimed to be a painter and said he used those chemicals in his profession. He admitted, however, that he did not use that vehicle for work. Detective Gottas testified that due to his police training, he understood that acetone and naphtha are commonly used to make methamphetamine. Given the information that Detective Gottas had gathered prior to the traffic stop, including the information about the iodine

crystals gained via the wire worn by the confidential informant together with the empty chemical containers in the trunk, the officers had sufficient probable cause to extend the search to the interior of the vehicle where the iodine crystals were found. Because the search of the car was properly conducted and did not violate Barrett's Fourth Amendment rights, the physical evidence found in that search should not have been suppressed by the trial court on Fourth Amendment grounds. To the extent that the state's assignment of error relates to the suppression of physical evidence found inside Barrett's vehicle, it is sustained.

## WARRANTLESS ENTRY INTO WHITE'S HOME

{¶ 17} The Fourth Amendment to the United States Constitution protects people from unreasonable searches and seizures. The Ohio Constitution contains a similar provision. Section 14, Article I, Ohio Constitution. State courts must exclude all evidence obtained in violation of that right. *Mapp v. Ohio* (1961), 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081. "A warrantless entry into a home to make a search or arrest is *per se* unreasonable, and the burden of persuasion is on the state to show the validity of the search." *State v. Nields* (2001), 93 Ohio St.3d 6, 15, 752 N.E.2d 859. Exigent circumstances, however, may justify a warrantless entry. *State v. Applegate* (1994), 68 Ohio St.3d 348, 626 N.E.2d 942, at syllabus. "One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury. 'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal * * *.' " *Brigham City, Utah v. Stuart* (2006), 547 U.S. 398, 403, 126 S.Ct. 1943, 1947, 164 L.Ed.2d 650, quoting *Mincey v. Arizona* (1978), 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290. "Thus, the emergency aid exception allows officers to enter a dwelling without a warrant and without probable cause when they reasonably believe, based on specific and articulable facts, that [someone] is in need of immediate aid." *State v. Gooden*, 9th Dist. No. 23764, 2008-Ohio-178, 2008 WL 186646, at ¶ 6, citing *Mincey v. Arizona* (1978), 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290; *People v. Davis* (1993), 442 Mich. 1, 25–26, 497 N.W.2d 910. "The key issue is whether the officers 'had reasonable grounds to believe that some kind of emergency existed * * *. The officer must be able to point to specific and articulable facts, which, taken with rational inferences from those facts, reasonably warrant intrusion into protected areas.' " Id., quoting *Davis*, 442 Mich. at 20, 497 N.W.2d 910.

{¶ 18} In order to enter a home without a warrant under the emergency-aid exception, an officer must have a "reasonable belief that it was necessary to investigate an emergency threatening life and limb." *State v. Applegate* (1994), 68 Ohio St.3d 348, 350, 626 N.E.2d 942. Although this exception to the warrant requirement does not require probable cause, the officers must have "some

reasonable basis, approaching probable cause, to associate an emergency with the area or place to be searched." *State v. Gooden*, 9th Dist. No. 23764, 2008-Ohio-178, 2008 WL 186646, at ¶ 8, quoting *State v. Sandor*, 9th Dist. No. 23353, 2007-Ohio-1482, 2007 WL 936739, at ¶ 9. "That is, there must be specific facts, discovered prior to the warrantless entry, that would lead a prudent officer to the objectively reasonable belief that this is, in fact, the scene of an emergency." Id. Regardless of the officers' subjective motivation, the question is whether "the circumstances, viewed *objectively* justify [the] action." (Emphasis sic.) *Brigham City v. Stuart* (2006), 547 U.S. 398, 404, 126 S.Ct. 1943, 1948, 164 L.Ed.2d 650, quoting *Scott v. United States* (1978), 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168; see also *State v. Rinard*, 9th Dist. No. 06CA0017, 2006-Ohio-5633, 2006 WL 3055497, at ¶ 8.

{¶ 19} This court has previously held that the danger that clandestine methamphetamine laboratories pose to occupants, officers, and the community is such that "the suspected production of methamphetamine constitutes per se exigent circumstances." *State v. Sandor*, 9th Dist. No. 23353, 2007-Ohio-1482, 2007 WL 936739, at ¶ 10. In other words, this court has previously held that a methamphetamine laboratory is, as a matter of law, an emergency threatening life and limb that supports an objectively reasonable belief that immediate action is necessary to protect life or property. The emergency-aid exception to the warrant requirement, unlike other types of exigent circumstances, does not require probable cause. Application of the emergency-aid exception demands " 'some reasonable basis, approaching probable cause, to associate an emergency with the area or place being searched.' " *State v. Gooden*, 9th Dist. No. 23764, 2008-Ohio-178, 2008 WL 186646, at ¶ 8, quoting *State v. Sandor*, 9th Dist. No. 23353, 2007-Ohio-1482, 2007 WL 936739, at ¶ 9.

■■■ {¶ 20} Section 2933.33 of the Ohio Revised Code provides, "If a law enforcement officer has probable cause to believe" that there is a methamphetamine laboratory on the premises, then "the risk of explosion or fire from the illegal manufacture of methamphetamine causing injury to the public constitutes exigent circumstances and reasonable grounds to believe that there is an immediate need to protect the lives, or property, of the officer and other individuals in the vicinity of the illegal manufacture." Although a state can provide its citizens with a higher level of protection from warrantless searches and seizures than provided by federal law, this does not appear to be what the General Assembly intended to do in adopting Section 2933.33. See *State v. Brown*, 99 Ohio St.3d 323, 2003-Ohio-3931, 792 N.E.2d 175, ¶ 21. While providing that "probable cause to believe" that a methamphetamine laboratory exists on the premises constitutes "exigent circumstances," it does not provide that "reasonable grounds to believe" that a methamphetamine laboratory exists does not constitute "exigent circum-

stances." This court concludes that the emergency-aid exception to the warrant requirement applies in this case, and probable cause is not required. Therefore, in the case of methamphetamine laboratories, if officers have a reasonable belief, based upon specific facts discovered prior to entry, that a methamphetamine laboratory is being operated at a particular location, the emergency-aid exception applies, and the officers may enter the premises in order to protect the public.

{¶ 21} White has correctly argued that the Fourth Amendment does not permit police officers to deliberately create exigent circumstances in order to gain entry to a private dwelling without a warrant. *State v. Jenkins* (1995), 104 Ohio App.3d 265, 271, 661 N.E.2d 806; *United States v. Munoz–Guerra* (C.A.5, 1986), 788 F.2d 295, 298. In this case, however, the exigent circumstance was not the destruction of evidence precipitated by the officers' conduct, but the danger of fire and explosion presented by the clandestine production of methamphetamine. The officers in this case had more than enough information, discovered prior to the warrantless entry, to lead a prudent officer to the objectively reasonable belief that White's residence was, in fact, the scene of an emergency—that is, that a methamphetamine laboratory was being operated inside the house. Detective Gottas testified that before entering the house, the police had received three tips, from three separate sources, regarding a methamphetamine laboratory at White's residence. In addition, the police had monitored conversations, had found physical evidence of methamphetamine production in Barrett's possession, and had heard Barrett admit to a possible methamphetamine laboratory at White's house. The officers were justified in entering the house without a warrant under the emergency-aid exception to the warrant requirement, because this court has held that operation of a methamphetamine laboratory constitutes an emergency threatening life and limb, and the police had obtained sufficient information to create an objectively reasonable belief that a methamphetamine laboratory was being operated at that address.

## WARRANTLESS SEARCH OF WHITE'S HOME

{¶ 22} The duration and scope of a warrantless search based upon any exigent circumstances "must be 'strictly circumscribed by the exigencies which justify its initiation.'" *State v. Applegate* (1994), 68 Ohio St.3d 348, 350, 626 N.E.2d 942, quoting *Terry v. Ohio* (1968), 392 U.S. 1, 26, 88 S.Ct. 1868, 20 L.Ed.2d 889. Thus, if the entry was justified by the emergency-aid doctrine, a search was also justified, but only to the extent reasonably necessary to render emergency assistance. *State v. Burchett*, 2d Dist. No. 20166, 2004-Ohio-3095, 2004 WL 1348112, at ¶ 17; *People v. Davis* (1993), 442 Mich. 1, 26, 497 N.W.2d 910. In this case, the officers testified that they heard glass breaking on the second floor prior to entering the house. Therefore, they broke down the door

and ran upstairs, where they secured White inside a second-floor bedroom. Other officers then went downstairs to the basement to check for people who may have been hiding. Police officers entered every room in the house prior to obtaining a search warrant. There was no evidence that the officers did anything to monitor the emergent risk of explosion that had justified their entry into White's home.

{¶ 23} The state in this case has argued that the officers legally performed a "protective sweep" of White's residence immediately following their warrantless entry. Officers are not permitted to complete a routine protective sweep of the entire premises incident to every arrest completed inside a private dwelling. *Athens v. Wolf* (1974), 38 Ohio St.2d 237, 241–243, 67 O.O.2d 317, 313 N.E.2d 405. The state has correctly stated that incident to a lawful arrest inside a residence, a cursory visual inspection of those places where someone might be hiding may be appropriate. As the state has acknowledged, however, generally such a search is appropriate only where police have a reasonable belief based on articulable facts that the residence contains persons posing a threat to the officers or others. See, e.g., *Maryland v. Buie* (1990), 494 U.S. 325, 336, 110 S.Ct. 1093, 108 L.Ed.2d 276 ("The type of search we authorize today * * * is decidedly not 'automati[c],' but may be conducted only when justified by a reasonable, articulable suspicion that the house is harboring a person posing a danger to those on the arrest scene"). A protective sweep in an emergency-aid situation may also be appropriately aimed at locating potential victims of the emergency, but the state did not make that argument in this case.

{¶ 24} The "police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Middletown v. Flinchum* (2002), 95 Ohio St.3d 43, 46, 765 N.E.2d 330 (Pfeifer, J., dissenting), quoting *Welsh v. Wisconsin* (1984), 466 U.S. 740, 749–750, 104 S.Ct. 2091, 80 L.Ed.2d 732. In this case, the record does not contain evidence that the officers had any reason to believe that anyone other than White was inside the house when they broke down the door. As the Ohio Supreme Court noted in *Athens v. Wolf* (1974), 38 Ohio St.2d 237, 242, 67 O.O.2d 317, 313 N.E.2d 405, it appears here that "the drug raid * * * was executed quickly and well. All occupants * * * were taken by surprise, and offered no resistance whatsoever." The officers had no indication, either before or after securing White, that anyone else was in the house. Therefore, the officers did not have the authority to enter every room in the house prior to obtaining a search warrant.

{¶ 25} It is clear, however, that prior to entering the home, the officers had probable cause sufficient to obtain a search warrant for the premises. "[T]he standard for probable cause does not require a prima facie showing of criminal activity; rather, the standard requires 'only a showing that a probability of

criminal activity exists.'" *State v. Tejada*, 9th Dist. No. 20947, 2002-Ohio-5777, 2002 WL 31387237, at ¶ 8, quoting *State v. Young* (2001), 146 Ohio App.3d 245, 254, 765 N.E.2d 938. Detective Gottas testified that before entering the house, the police had received three tips, from three separate sources, regarding a methamphetamine laboratory at White's residence. In addition, they had monitored conversations of Barrett and White on the day of the search. The police had also found physical evidence of methamphetamine production in Barrett's possession and had heard Barrett admit to a possible methamphetamine laboratory at White's house. The police testified that they believed they had probable cause for a warrant before entering the home, and Barrett, White, and the trial court all agreed. This court also agrees that taken together, these specific facts constitute probable cause to support a search warrant.

{¶ 26} It is not clear from the record exactly what items were found in plain view during that initial sweep of the residence that were later used to support probable cause for the search warrant. This is of no consequence, however, because probable cause for the search warrant existed prior to the police entry. Thus, anything found during the illegal protective sweep was unnecessary to support the warrant and may be excised from the affidavit without affecting the legality of the subsequent search. *State v. Golubov*, 9th Dist. No. 05CA0019, 2005-Ohio-4938, 2005 WL 2292822, at ¶ 22, citing *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, at ¶ 17. Furthermore, anything found during that initial cursory inspection would inevitably have been discovered in the ensuing search completed pursuant to the warrant. Therefore, anything discovered in that initial search would be admissible under the inevitability of discovery exception to the exclusionary rule. *State v. Jackson* (1991), 57 Ohio St.3d 29, 36, 565 N.E.2d 549, citing *Nix v. Williams* (1984), 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377.

{¶ 27} A properly issued search warrant is the preferred method whenever police are to enter a private dwelling without consent. The exigency created by the suspected methamphetamine laboratory in this instance, however, justified the officers' actions. Despite the illegal protective sweep of the residence, the physical evidence found should not have been suppressed. Nothing discovered in that search was necessary to support the search warrant, and all of it inevitably would have been discovered legally pursuant to that warrant. Therefore, to the extent that the state's assignment of error pertains to the trial court's order prohibiting the use of items found in the search of White's house in the state's case against White, it is sustained.

### BARRETT'S CHALLENGE TO THE SEARCH OF WHITE'S HOME

{¶ 28} The state has argued that the trial court also erred in suppressing the fruit of the search of White's home in the case against Barrett. The state has

erroneously couched its argument in terms of "standing" to challenge the search, an analysis specifically rejected by the United States Supreme Court in *Rakas v. Illinois* (1978), 439 U.S. 128, 139–140, 99 S.Ct. 421, 58 L.Ed.2d 387, as cited in *Minnesota v. Carter* (1998), 525 U.S. 83, 87, 119 S.Ct. 469, 142 L.Ed.2d 373. The state has correctly argued, however, that one cannot vicariously assert a Fourth Amendment right to be free from unreasonable searches and seizures. *State v. Young* (Mar. 8, 2000), 9th Dist. No. CA19353, 2000 WL 254893, at *2, citing *Rakas*, 439 U.S. at 139, 143, 99 S.Ct. 421, 58 L.Ed.2d 387. "[T]he Fourth Amendment protects people, not places." *Katz v. United States* (1967), 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576, as quoted in *Minnesota v. Carter* (1998), 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373. A defendant may not challenge a search on Fourth Amendment grounds unless he possesses "a legitimate expectation of privacy in the place searched that society is prepared to recognize as reasonable." *State v. McCraney* (Nov. 27, 1996), 9th Dist. No. 17683, 1996 WL 688257, at *3, citing *Rakas*, 439 U.S. at 143, 99 S.Ct. 421, 58 L.Ed.2d 387 and fn. 12. Barrett has argued that as an overnight guest, he had a legitimate expectation of privacy in White's home, sufficient for him to challenge the warrantless search. This court has determined that the inevitable-discovery exception to the exclusionary rule applies to permit the state to use any physical evidence found during the initial illegal protective sweep. Therefore, it is unnecessary for this court to determine whether Barrett had a reasonable expectation of privacy in those premises. To the extent that the state's assignment of error pertains to the trial court's suppression of the fruits of the warrantless search of White's house in the case against Barrett, it is sustained because of the application of the inevitable-discovery exception to the exclusionary rule.

{¶ 29} On appeal, Barrett has challenged the constitutionality of R.C. 2933.33. He did not, however, raise that argument before the trial court. Therefore, Barrett forfeited the opportunity to make that argument on appeal. *State v. Worrell*, 9th Dist. Nos. 23378 and 23409, 2007-Ohio-7058, 2007 WL 4554455, at ¶ 7, citing *State v. Awan* (1986), 22 Ohio St.3d 120, 22 OBR 199, 489 N.E.2d 277, syllabus.

## CONCLUSION

{¶ 30} The trial court's order suppressing physical evidence found in the warrantless search of Barrett's vehicle and the warrantless search of White's home, as well as the statement made by Barrett during the traffic stop, is reversed. Barrett's statement that there might be a methamphetamine laboratory at White's house should not have been suppressed because, although custodial, it was made voluntarily and not in response to any question or statement from police officers. Because the traffic stop and search of the car were properly

conducted and did not violate Barrett's Fourth Amendment rights, the physical evidence found in that search should not have been suppressed. The physical evidence recovered from White's house should not have been suppressed because the officers' warrantless entry was legal under the emergency-aid exception to the warrant requirement. Although the ensuing protective sweep was illegal, the items discovered during that initial search inevitably would have been found during the subsequent legal search supported by the search warrant. Therefore, none of the contested evidence should have been suppressed by the trial court.

Judgment reversed
and cause remanded.

SLABY, P.J., and CARR, J., concur in judgment only.

SLABY, Presiding Judge, concurring in judgment only.

{¶ 31} Based on my review of the record, I would conclude that the police officers had probable cause to believe a methamphetamine lab was being operated at White's residence. Defendants also acknowledge that the officers had probable cause sufficient to obtain a warrant. Testimony adduced at the suppression hearing established that (1) the police had two prior tips that a meth lab was being operated on the premises, (2) a reliable confidential informant ("CI") was in and out of White's home and confirmed the operation of the meth lab, (3) the CI and Barrett were at White's home on August 3, 2006, (4) the CI and Barrett left White's home to purchase iodine crystals used for the manufacture of methamphetamine, (5) the crystals were purchased on August 3, 2006, and were in the possession of Barrett, (6) an empty container of naphtha and acetone was found in Barrett's car, (7) naphtha, acetone, and iodine crystals are ingredients used to manufacture methamphetamine, and (8) Barrett stated that there might be a meth lab at White's home.

{¶ 32} Next, I turn to the issue of exigent circumstances. Upon arriving at the residence, officers went to the front and side door. They identified themselves and knocked on the doors. They observed White running from the first floor to the basement and from the basement to the second floor. Finally, they heard breaking glass, which the officers believed to be the destruction of glassware used to make methamphetamine. The officers at that point had exigent circumstances based on "reasonable grounds" or a "reasonable suspicion" that evidence was being destroyed.

CARR, Judge, concurring in judgment only.

{¶ 33} Regardless of which doctrine we use, "emergency aid" or general exigency, the highest standard we ever require is "probable cause." As the

parties concede that probable cause was met here, we need not reach the issue of the appropriate standard applicable to these facts.