[Cite as *State v. Elkins*, 2017-Ohio-2725.]

**IN THE COURT OF APPEALS**

**ELEVENTH APPELLATE DISTRICT**

**TRUMBULL COUNTY, OHIO**

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2016-T-0035** |
| ALLEN LEE ELKINS, IV, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Trumbull County Court of Common Pleas, Case No. 2014 CR 00528.

Judgment: Affirmed.

*Dennis Watkins*, Trumbull County Prosecutor, and *LuWayne Annos*, Assistant Prosecutor, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481-1092 (For Plaintiff-Appellee).

*Michael A. Partlow*, 112 South Water Street, Suite C, Kent, OH 44240 (For Defendant-Appellant).

THOMAS R. WRIGHT, J.

{¶1} Appellant, Allen L. Elkins, IV, appeals his multiple convictions following a jury trial. For the following reasons, we affirm.

{¶2} On June 21, 2014, Elkins and two others broke into a home in Warren, Ohio at approximately 1:00 a.m. One of the four residents home at the time, Kyle Snowden, went to the kitchen to get some Kool-Aid and saw the backdoor open as well

as all three intruders holding guns. One intruder then shot one of the resident's dogs between the eyes. Another of the three men fired a gun toward Kyle, but missed, and Kyle ran away.

{¶3} Eric McKnight and Joy Biehl were in the basement, Eric's room. Joy shared the attic bedroom with her boyfriend Zach, who was not home. Eric heard a gunshot and upon seeing his bloody dog, turned the basement lights off and grabbed his gun. Eric heard someone yelling "Where's Zach at?"

{¶4} The intruders entered the living room on the main floor where Kyle and Seth Fletcher had been playing videogames and smoking marijuana before Kyle went to get a drink. Seth described hearing one of the intruders asking "where's the pounds of loud?", slang for high quality marijuana. And when Seth told them he did not have that, one of the intruders punched him in the face, pistol whipped him, and dragged him into the kitchen where he was pistol whipped in the face by another intruder.

{¶5} Seth then heard the intruders arguing about which one of them was going to go downstairs out of fear that the dog was still alive. Elkins then forced Seth down the basement stairs in front of him while holding a gun to Seth's head. Seth testified that the basement was pitch black except for the snake tank light and the light coming down the stairs from the back porch light. The intruders kept asking for "pounds of loud" and Zach. Later that same morning, Seth identified Elkins in a photo lineup as the man who pistol whipped him, forced him downstairs at gunpoint, and shoved him into a table. Seth also identified Elkins during trial.

{¶6} Joy recalls hearing the backdoor getting kicked in. She heard a gunshot and the dog yelping and then recalls "freaking out" and turning off lights in the

2

basement. She heard more gunshots before anyone came downstairs. She recalls Elkins coming down the stairs alone at first, but then he came down again using Seth as a shield. Elkins was searching for something.

{¶7} Upon reaching the bottom of the steps or very near to the bottom of the stairs, Elkins shoved Seth into a table breaking it. A gun battle between Elkins and Eric ensued. Joy testified that Elkins fired his gun first while Eric was searching for his gun, and that Eric shot back. Elkins shot Eric in the calf.

{¶8} Eric fired multiple shots and hit Elkins once in each leg. Elkins' friend or friends then came to the basement and helped him up the stairs and out the back door. The testimony is unclear as to whether one or both of his accomplices came to the basement to aid Elkins. Eric recalls only being able to see shadows. Both Eric and Joy recall Elkins wearing a fishing or safari-type hat.

{¶9} A neighbor testified to hearing loud noises from his open bedroom window. When he looked outside, he saw a red car driving down the street.

{¶10} Seth and Joy called 911 from the basement. Eric went upstairs, exited the backdoor, and laid on the sidewalk bleeding. The police arrived a short time later. Eric was immediately taken to a local hospital. Joy went upstairs and found Kyle hiding in her attic bedroom with her dog.

{¶11} Eric was questioned in the emergency room. Elkins was in the emergency department at another local hospital suffering from two gunshot wounds. The hospital security footage shows Elkins being wheeled into the entrance by a man covering his face and exiting a red car. Elkins' accomplices were not identified or charged.

3

{¶12} Detective Marsico of the Warren City Police Department went to Elkins' emergency room that morning and introduced himself. Elkins immediately said something to the effect that he would own up to what he had done that night.

{¶13} At trial, defense counsel asserted in his opening statement and closing argument that the victims were lying and that they ambushed Elkins in an attempt to rob him of his drug buy money.

{¶14} Elkins testified that he was Seth's heroin dealer for a few months before this, and that Seth offered to sell him two pounds of really good marijuana at a good price that night. He said Seth lied when he denied knowing him. Elkins explained that he went to the home to buy the marijuana. And upon entering the basement, he was counting out his money when he claims that Seth pulled a gun on him.

{¶15} Elkins testified that he and Seth wrestled for the gun when it discharged and hit Eric. Eric then returned fire and shot Elkins twice before his friends, who had been waiting outside, came down to get him and drive him to the hospital.

{¶16} Elkins was convicted of aggravated burglary with a firearm specification and repeat violent offender specification; aggravated burglary with a firearm specification and repeat violent offender specification; felonious assault with a firearm specification and repeat violent offender specification; kidnapping with a firearm specification and repeat violent offender specification; and aggravated robbery with a firearm specification and repeat violent offender specification. He was found not guilty of two counts of felonious assault and the attendant specifications. He was sentenced to a total aggregate term of 54 years. Elkins raises four assignments of error:

**{¶17}** "The trial court erred, as a matter of law, by denying appellant's motion to dismiss based upon his speedy trial rights being violated.

**{¶18}** "The trial court erred as a matter of law by failing to grant the appellant's motion to suppress statements allegedly made by appellant to a police officer while appellant was in the hospital.

**{¶19}** "The appellant received ineffective assistance of trial counsel.

**{¶20}** "Appellant's convictions are against the manifest weight of the evidence."

**{¶21}** First Elkins argues the trial court was required to dismiss the charges against him since it violated his speedy trial rights by failing to bring him to trial within the statutory time frame.

**{¶22}** The right to a speedy trial is set forth in the Sixth Amendment to the United States Constitution and is obligatory on the states via the Fourteenth Amendment. *State v. Broughton*, 62 Ohio St.3d 253, 256, 581 N.E.2d 541 (1991). R.C. 2945.73(B) requires a person charged with an offense to be discharged if he is not brought to trial within the applicable speedy trial time, and discharge bars "any further criminal proceedings against him based on the same conduct." R.C. 2945.73(D).

**{¶23}** Ohio courts must strictly enforce the right to a speedy trial. *State v. Pachay,* 64 Ohio St.2d 218, 416 N.E.2d 589 (1980). Appellate review of speedy trial issues generally present mixed questions of law and fact. *State v. Hiatt*, 120 Ohio App. 3d 247, 261–63, 697 N.E.2d 1025 (4th Dist.1997). We must accept the facts as found by the trial court based on some competent, credible evidence, but review the application of the law to the facts de novo. *Id.; State v. Kist,* 173 Ohio App.3d 158, 2007-Ohio-4773, 877 N.E.2d 747, ¶17-18 (11th Dist.).

**{¶24}** A defendant establishes a prima facie case for dismissal once he demonstrates that he was not brought to trial within the applicable statutory speedy trial time limit, and the burden then shifts to the state to prove that the defendant's right has not been violated in light of applicable tolling periods. *Kist* at ¶22; *State v. Smith*, 11th Dist. Ashtabula No. 2000–A–0052, 2001 WL 901016, *5 (Aug. 10, 2001), citing *State v. Butcher* (1986), 27 Ohio St.3d 28, 500 N.E.2d 1368.

**{¶25}** Elkins' speedy trial argument hinges on the trial court's delay in ruling on his motion to suppress. He asserts that the 260-day delay between the filing of his motion and the trial court's ruling was unreasonable, precludes tolling, and should be charged against the state, in part.

**{¶26}** A motion to suppress extends a defendant's speedy trial time. *State v. Lemons*, 11th Dist. Trumbull No. 2009-T-0032, 2010-Ohio-3807, ¶120. However, Elkins relies on *State v. Staffin*, 4th Dist. Ross No. 07CA2967, 2008-Ohio-338, in averring that nothing in the record explains the extensive delay in the trial court's ruling on his motion to suppress, and as such, its extensive delay was presumptively unreasonable.

**{¶27}** "Normally, the time spent by a trial court in determining the issues raised in a defendant's motion does not count against the time limit for bringing the defendant to trial, so long as the time spent is not excessive and unjustified by the record." *State v. Baker*, 12th Dist. Fayette No. CA2005-05-017, 2006-Ohio-2516, ¶25, citing *State v. Arrizola*, 79 Ohio App.3d 72, 76, 606 N.E.2d 1020 (1992). Stated otherwise, and as appellant contends, a considerable delay by a trial court in ruling on a defense motion without justification is charged to the state. *Id.*

6

**{¶28}** In *State v. Baker*, the Twelfth District held that the 252-day delay between the defendant's motion seeking reconsideration of his suppression motion and its denial was not entirely chargeable to Baker. Instead it found that only 120 days of the delay was chargeable to the defense for speedy trial purposes because the record did not demonstrate that the trial court needed more than 120 days to rule on motion. *Id.* at ¶43.

**{¶29}** Contrary to Elkins' argument, however, the entirety of the delay here was chargeable to him. Trial counsel filed Elkins' initial motion to suppress his statements December 10, 2014. This filing tolled the speedy trial time. The suppression hearing was scheduled for March 27, 2015. However, instead of proceeding, trial counsel sought a continuance because he wanted to amend the suppression motion to include an additional reason in support. Elkins stated that he was in agreement with continuing the suppression hearing from March 27, 2015 until June 5, 2015. Thereafter, Elkins' counsel did not file his amended motion until July 16, 2015. As a result, the suppression hearing was reset to July 31, 2015. Upon concluding the July 31, 2015 suppression hearing, the court asked counsel to submit proposed findings of fact and conclusions of law by August 19, 2015. The trial court subsequently ruled on Elkins' motion less than a month after the hearing on August 27, 2015.

**{¶30}** Thus, contrary to his claims, Elkins' counsel's amended motion to suppress was the reason for the delay in the court's ruling. Moreover, the trial court issued its decision only eight days after the parties submitted their proposed findings. Unlike *Baker,* supra, the 260-day delay was properly charged against Elkins as extending his speedy trial time since the delay was justified.

**{¶31}** Elkins' first assigned error lacks merit and is overruled.

**{¶32}** Elkins next challenges the trial court's denial of his motion to suppress his statements to a police officer made while he was hospitalized the day of the offenses.

**{¶33}** Following the suppression hearing, the trial court granted the motion to suppress in part, stating:

**{¶34}** "Defendant's initial statements to Detective Marsico were voluntary. Counsel for the Defendant is free to argue at trial that Defendant's statements were not reliable given his condition. The standard for admissibility is whether the statements were voluntarily given. * * *

**{¶35}** "Here, it cannot be said that the purpose of Detective Marsico's inquiry was to ensure his safety rather than elicit an incriminating response. The defendant was already in the hospital receiving care for his injuries, and the WPD had contacted all hospitals specifically seeking out black males who had been shot. The Defendant was not at liberty to leave as he was being guarded by officers outside his door, and further due to his medical condition, he was physically unable to remove himself from the interrogation. The state concedes that Defendant was in custody. There is no dispute that Defendant was not advised of his Miranda rights. * * * Detective Marsico's question constituted a custodial interrogation. Any statements made by the Defendant * * * after Detective Marsico asked him where he got shot shall be deemed inadmissible. Any statements made prior to the inquiry are voluntary statements and are deemed admissible."

8

**{¶36}** At trial, Marsico testified that upon introducing himself to Elkins, Elkins said, "What happened tonight I did and I will man up to that." This is the only statement now in issue.

**{¶37}** Elkins argues the court should have suppressed all of his statements made while he was hospitalized for two reasons. First, he claims his statements are wholly inadmissible since he was never given a *Miranda* warning. Second, he claims because he was suffering severe pain, his statements were involuntary and inadmissible in violation of his due process rights.

**{¶38}** Appellate review of a motion to suppress is a mixed question of law and fact. The trial court sits as the fact finder at the hearing and is best able to weigh the evidence and determine witness credibility. *State v. McGary,* 11th Dist. Trumbull No. 2006–T–0127, 2007–Ohio–4766, ¶20; *State v. Mills,* 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992). Thus, we must accept the trial court's factual findings as true if supported by competent, credible evidence. *State v. Hatcher*, 11th Dist. Portage Nos. 2012-P-0077 and 2012-P-0078, 2013-Ohio-445, ¶8-9; *State v. Retherford,* 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994). Upon accepting the trial court's findings as true, an appellate court independently determines as a matter of law whether the applicable legal standard was satisfied. *Id.*

**{¶39}** The U.S. Supreme Court's decision in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602 (1966), was designed to preserve an individual's Fifth Amendment right prohibiting a person from being compelled in a criminal case to be a witness against himself. *State v. Buchholz,* 11 Ohio St.3d 24, 27, 462 N.E.2d 1222 (1984). However, an individual can waive his constitutional rights to silence and counsel if the waiver is

9

made voluntarily, knowingly, and intelligently. *Id.*; *State v. Jenkins*, 15 Ohio St.3d 164, 231, 473 N.E.2d 264 (1984).

**{¶40}** "In addition to the requirements of *Miranda*, due process provisions of the federal Constitution dictate that the state must meet by a preponderance of the evidence its burden of proving that any inculpatory statement was made voluntarily. * * * The court must determine whether the totality of the circumstances demonstrates that the statements are of the accused's free and rational choice." (Citations omitted.) *State v. Jenkins*, 15 Ohio St.3d 164, 231, 473 N.E.2d 264, 320 (1984). The use of a statement at trial found to be involuntarily given constitutes a denial of due process and is reversible error. *Id.* at 232, citing *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408 (1978). Whether a statement is given voluntarily must be determined on a case-by-case analysis based upon a close examination of "police conduct, appellant's (mental and physical) condition, and other attendant conditions." *Jenkins* at 233.

**{¶41}** Elkins moved to suppress his custodial statements made to Detective Marsico alleging that they were not voluntary based on the extreme pain he was suffering at the time from his gunshot wounds. Thus he alleges his statements were not the product of rational intellect and free will. The trial court disagreed, but excluded Elkins' custodial statements made once Marsico began questioning him as violative of his Fifth Amendment right.

**{¶42}** Elkins was not given *Miranda* warnings. Detective Patrick Marsico of the Warren Police Department arrived at the hospital after being advised that a patient with gunshot wounds was in the emergency room. Upon Marsico's arrival, he was advised that the patient was Elkins, who Marsico knew had warrants for his arrest. Marsico was

10

also aware the suspect in the shooting he was investigating was a black male with gunshot wounds and that Elkins is a black male.

**{¶43}** Officers were guarding Elkins' room when Marsico arrived at about 2:50 a.m. Marsico entered Elkins' emergency treatment room and introduced himself to Elkins, and according to Marsico, Elkins immediately started talking about a different case and said how he had not stolen from a woman and that she was lying. Elkins said something to the effect of "what he did tonight he will owe up to but he didn't steal from a woman."

**{¶44}** Marsico explained during the suppression hearing that Elkins was speaking about allegations his ex-girlfriend had made against him involving theft, which although the detective was aware of this other active case, Marsico was not involved in its investigation. The theft offense as alleged by Elkin's ex-girlfriend did not occur this same day as the instant offenses. Marsico did not ask Elkins any questions about this other theft case, and instead proceeded to ask Elkins where he was at the time he was shot.

**{¶45}** Contrary to Elkins' argument, the trial court correctly found that his statements made in response to Detective Marsico's introduction of himself was not worthy of Fifth Amendment protection because there was no interrogation at this point. Elkins' initial statements made to Marsico were not made in response to any questioning or interrogation, but were instead spontaneous.

**{¶46}** "Volunteered statements * * * are not barred by the Fifth Amendment. *Rhode Island v. Innis* (1980), 446 U.S. 291, 300, 100 S.Ct. 1682, 1689. Further, 'the special procedural safeguards outlined in *Miranda* are required not where a suspect is

11

simply taken into custody, *but rather where a suspect in custody is subjected to interrogation.' Id.*  * * *  "'Interrogation," as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.' *Id.* Interrogation includes words or actions on the part of the police that the police 'should know are reasonably likely to elicit an incriminating response.' *Id.* at 301, 100 S.Ct. 1689." (Emphasis added.)  *State v. Ambartsoumov*, 10th Dist. Franklin No. 09AP-1054, 2010-Ohio-6293, 2010 WL 5385439, ¶71.

**{¶47}**  In *State v. White*, 175 Ohio App.3d 302, 2008-Ohio-657, 886 N.E.2d 904 (9th Dist.), the state appealed the trial court's suppression of the defendant's statement made while in custody before he was given *Miranda* warnings.  The defendant was stopped for speeding, was handcuffed, and was being led to the police cruiser when he told the officer that he thought there may be a methamphetamine lab at his ex-girlfriend's house.  *Id.* at ¶7.  His statement was not in response to any police question or statement, but was spontaneous.  *Id.* at ¶6.  Notwithstanding that the defendant was in custody at the time of his statement, the statement was not the result of interrogation because it was not made in response to any police questioning or any remark that an officer should know is "reasonably likely to elicit an incriminating response."  (Citations omitted.)  *Id.* at ¶13.

**{¶48}** Here, like in *White*, the trial court correctly overruled Elkins' motion seeking to suppress his initial statements made to Marsico at the hospital since the same were not made in response to any police question or a statement reasonably likely to elicit an incriminating response.  Thus, the introduction of the same at trial did not violate Elkins' right against self incrimination.

{¶49} As for the second aspect of Elkins' argument, we also agree with the trial court's determination that his initial statements to Marsico were voluntarily made and do not violate his due process rights. Independent of whether his statements resulted from a custodial interrogation, Elkins' statements must have also been voluntarily given, resulting from his free will and rational choice, to satisfy due process. *Jenkins* at 232.

{¶50} Elkins directs our attention to *Mincey* and *Jenkins*, supra, in support of his claim that his statements to Marsico were not voluntarily given and should have been suppressed.

{¶51} In *Mincey*, the defendant was in and out of consciousness during four hours of questioning by the police while in the hospital suffering from gunshot wounds. Mincey was unable to talk and had to write his answers to their questions. Moreover, Mincey repeatedly tried to stop his interrogation, but the officers ignored his requests. Mincey also told the officers that he was confused and unable to accurately answer them. He was weakened by pain and shock and was barely conscious at the time of the confession. As a result of the facts in *Mincey*, the U.S. Supreme Court found his statements involuntary, and as such, his conviction could not stand. *Jenkins* at 232, citing *Mincey* at 401.

{¶52} However, in *Jenkins*, the Ohio Supreme Court found no violation of the defendant's rights after examining the indicia of trustworthiness present in the case before them. *Jenkins* explained:

{¶53} "Although both cases [*Jenkins and Mincey*] involve a wounded murder suspect's hospital statements, the circumstances of the interrogations are factually distinguishable. In the case sub judice the record reveals that the appellant's blood

13

pressure was improving and was more or less stable at the time of questioning. The entire episode lasted no more than forty-five minutes during which the appellant was always conscious. Unlike Mincey, who could not then speak, testimony reveals that appellant could converse and did so in a normal voice. The state's witnesses indicated that appellant understood his rights and expressed a willingness to talk with the police. When appellant indicated he no longer wished to speak with the officers, the interrogation was promptly terminated. The facts do not reveal an indication of police coercion or abuse. Detective Allen testified that he received permission to interview appellant from a doctor at the hospital prior to the questioning." *Id.* at 232.

**{¶54}** During the 15-20 minutes he was in Elkins' room, Marsico described him as bleeding from his gunshot wounds and moaning in pain. However, he said he was coherent and that he was "making sense." Elkins was not handcuffed or restrained. No hospital personnel were in the room at the time, but another officer was standing in the doorway. Marsico explained that he could not understand Elkins' response to certain questions since he was wearing an oxygen mask, and that he began grunting at the end of his words and shortening his words, but that he was conscious the entire time.

**{¶55}** On cross-examination, Marsico agreed that Elkins was in a considerable amount of pain since he had been shot and was bleeding, and Marsico recalls Elkins requesting pain medicine since he had not been given any up to that point. Upon leaving, Marsico gave Elkins his business card and advised him to call him if he wanted to talk.

**{¶56}** An emergency room nurse employed by the hospital also testified and confirmed he was working the morning of Elkins' gunshot wounds. Elkins entered the

14

hospital at 1:12 a.m. and was initially listed as semiconscious. Upon admission, he was suffering from two entry wounds in his right and left femurs. He was also hypotensive but his vital signs quickly improved upon receiving IV hydration and two units of blood. The nurse explained that "once getting hydrated with IVs and blood, they * * * come around."

{¶57} Thereafter, the doctor noted that Elkins was alert, oriented, and talking. The nurse explained this means the patient is "alert and oriented to * * * person, time and place." These alert and oriented notes were entered twice, at 1:35 a.m. and again at 1:49 a.m. Elkins' wounds did not require surgery and his CAT scan confirmed he did not have any acute fractures or vascular injuries.

{¶58} Elkins reported being a nine out of ten on the pain scale at approximately 3:30 a.m. The nurse confirmed that Elkins did not receive any pain medication until 5:30 a.m. after his interview with Marsico. Elkins had been only given antibiotics at the time of his interaction with Marsico. Upon discharge, Elkins left the hospital in a police cruiser.

{¶59} Unlike the defendant in *Mincey*, Elkins was documented as alert and oriented before his interaction with Marsico. Elkins' condition as "semiconscious" "quickly improved" upon his receipt of hydration and blood before his exchange with Marsico. Further, Marsico testified that Elkins was in pain, but that he was coherent when he offered the statement that he would own up to what he had done that night. Elkins did not testify to the contrary.

{¶60} Upon reviewing the totality of the circumstances, Elkins was alert and oriented prior to the time of the exchange. Although he was in significant pain and

15

hospitalized, there was nothing indicating he was confused. Thus, the trial court correctly concluded that his initial statements to Marsico were voluntary.

**{¶61}** Accordingly, Elkins' second assigned error lacks merit in its entirety.

**{¶62}** Elkins' third assignment of error claims the denial of effective assistance of counsel based solely on his trial counsel's alleged failure to argue that the trial court's delay in ruling on his suppression motion was unreasonable.

**{¶63}** To establish ineffective assistance of counsel, one must establish first that his or her counsel substantially violated counsel's essential duties to his client. *State v. Bradley,* 42 Ohio St.3d 136, 141–42, 538 N.E.2d 373 (1989), citing *Strickland v. Washington* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This requires a showing "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-688. In addition, there must be a determination that appellant was prejudiced by counsel's ineffectiveness. "To warrant reversal, '[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Bradley* at 142, quoting *Strickland* at 694.

**{¶64}** Because Elkins' trial counsel did not err in failing to argue that the delay in the trial court's ruling should have been charged to the state, there was no ineffective assistance. Elkins' third assigned error lacks merit and is overruled.

**{¶65}** Elkins' fourth and final argument alleges his convictions are against the manifest weight of the evidence.

**{¶66}** "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief.*' (Emphasis added.) Black's, *supra,* at 1594.

**{¶67}** "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a '"thirteenth *** juror"' and disagrees with the factfinder's resolution of the conflicting testimony. *Tibbs [v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211.] See, also, *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720–721 ('The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.')" *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

**{¶68}** If the trial court's judgment results from a jury trial, it can only be reversed on manifest weight grounds by a unanimous concurrence of all three judges on the appellate panel reviewing the case. *Id.* at 389. The fact that the evidence is susceptible to more than one interpretation does not render a conviction against the manifest weight

17

of the evidence. *State v. Ramey*, 2d Dist. Clark No. 2014-CA-127, 2015-Ohio-5389, 55 N.E.3d 542, ¶50, appeal not allowed, 145 Ohio St.3d 1458, 2016-Ohio-2807. "Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses." *Id.* at ¶51.

{¶69} Elkins does not challenge any one particular offense as against the manifest weight of the evidence. Instead, he generally directs our attention to three different alleged shortcomings in the state's case as establishing that his convictions are all against the weight of the evidence.

{¶70} First, Elkins directs our attention to his testimony that he knew Seth prior to the date of the offenses, and that Seth was dishonest when he denied knowing Elkins prior to the home invasion.

{¶71} Elkins testified that he sold Seth heroin 15-20 times prior to the offenses in question. Elkins also claimed that he originally knew Seth from Jamestown Village. Elkins testified that he was only at the home that morning because of his relationship with Seth, and that Seth had offered to sell him some really good marijuana for a low price, but then tried to rob him.

{¶72} As Elkins contends, Seth readily admits in his direct testimony to previously living in Jamestown Village. However, Seth denies ever knowing Elkins before the offenses.

{¶73} This inconsistent testimony by these two witnesses was before the jury. We cannot find that the jury clearly lost its way in believing Seth over Elkins. Seth's testimony was consistent with three other witnesses, and although all witnesses and

18

parties were either smoking marijuana, selling drugs, or both, nothing overtly bolsters Elkins' testimony as more credible than the others.

**{¶74}** Elkins next points to two facts testified to by the state's witnesses as establishing that the victims' version of the facts that morning lacked all credibility. And as a result of this allegedly incredible evidence, Elkins claims that the jury clearly lost its way in finding him guilty beyond a reasonable doubt.

**{¶75}** Specifically, Elkins claims that McKnight's testimony that the lights were turned off in the basement lacks credibility since both McKnight and Elkins were shot in spite of the total darkness.

**{¶76}** Joy, Eric, and Seth all testified that the lights were turned off in the basement that morning. Eric recalls being able to see shadows, and Joy testified that she was still able to see Elkins' face and that he was wearing a beige fishing hat. Further, Seth testified that the light in the snake tank was on, and he described being able to see shadows in the basement due to the light coming down the steps from the back porch light. Thus, it is not incredible that two people were shot in the legs despite having a dimly lit basement. Accordingly, Elkins' argument does not warrant reversal on manifest weight of the evidence grounds.

**{¶77}** Finally, Elkins challenges the victims' testimony that he descended the stairs with Seth as his human shield, but yet then shoved Seth into a table upon reaching the bottom of the stairs. Elkins claims that this alleged action made himself vulnerable and capable of getting shot, and that it makes no sense to toss aside a human shield. Thus, the jury should have rejected the victims' testimony and believed Elkins.

19

**{¶78}** However, both Eric and Seth confirmed that Elkins shoved Seth into the table before Elkins fired his gun at Eric and before Elkins was injured by Eric's returned gunfire. And contrary to Elkins' argument, there was no testimony that Elkins actually saw Eric before shoving Seth into the table. Moreover, in light of the testimony that the intruders argued about who was going to go downstairs due to fear over the tenants' dogs, it is plausible that Elkins was shielding himself from the dogs, not gunfire. Thus, upon reaching the bottom of the stairs, and not being accosted by the dog, Elkins pushed aside his human shield.

**{¶79}** The challenged testimony does not cause us to find his convictions are against the weight of the evidence. Elkins' version of the events that morning was before the jury by way of his testimony and attorney's arguments. The jury simply believed the other witnesses. Upon weighing the evidence and all reasonable inferences, and considering the credibility of witnesses and conflicts in the evidence, we do not find that the jury clearly lost its way. The fourth assigned error lacks merit and is overruled.

**{¶80}** Based on the foregoing, the judgment of the trial court is affirmed.


DIANE V. GRENDELL, J.,

COLLEEN MARY O'TOOLE, J.,

concur.

20