[Cite as *State v. Campbell*, 2013-Ohio-5823.]

**IN THE COURT OF APPEALS**

**ELEVENTH APPELLATE DISTRICT**

**ASHTABULA COUNTY, OHIO**

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2013-A-0035** |
| JUDD G. CAMPBELL, JR., | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Ashtabula County Court of Common Pleas, Case No. 2012 CR 573.

Judgment: Affirmed.

*Thomas L. Sartini,* Ashtabula County Prosecutor, and *Shelley M. Pratt,* Assistant Prosecutor, Ashtabula County Courthouse, 25 West Jefferson Street, Jefferson, OH 44047-1092 (For Plaintiff-Appellee).

*Ariana E. Tarighati,* Law Offices of Ariana E. Tarighati, L.P.A., 34 South Chestnut Street, #100, Jefferson, OH 44047-1092 (For Defendant-Appellant).

CYNTHIA WESTCOTT RICE, J.

{¶1} Appellant, Judd G. Campbell, Jr., appeals his conviction following a jury trial of illegal manufacture of methamphetamine ("meth") and illegal assembly or possession of chemicals for the manufacture of meth. At issue is whether the trial court erred in denying appellant's motion to suppress evidence. For the reasons that follow, we affirm.

{¶2} In October 2012, appellant was indicted for illegal manufacture of meth in the vicinity of a juvenile, a felony of the first degree, in violation of R.C. 2925.04 (Count One); illegal assembly or possession of chemicals for the manufacture of meth, also in the vicinity of a juvenile, a felony of the second degree, in violation of R.C. 2925.041 (Count Two); aggravated possession of meth, a felony of the third degree, in violation of R.C. 2925.11(Count Three); and endangering children, a felony of the third degree, in violation of R.C. 2919.22 (Count Four).

{¶3} Appellant pled not guilty and subsequently filed a motion to suppress. The court held a suppression hearing. Deputy Jay Thomas of the Ashtabula County Sheriff's Office testified he has held that position for 17 years. He received 80 hours of specialized training in cleaning clandestine meth labs in 2006, and has been certified to process meth labs by the Ohio Bureau of Criminal Identification and Investigation and the federal Drug Enforcement Agency for seven years. As part of his certification, he has been trained in the entire process of manufacturing meth.

{¶4} Deputy Thomas testified he is part of "Operation Meth Death," which is a joint task force whose officers arrest individuals who have been indicted for the manufacture of meth and the purchase of products used to manufacture meth.

{¶5} Deputy Thomas said that on August 29, 2012, at 8:00 a.m., he and five other task force officers were assigned to serve an arrest warrant on Amanda Olsen at her residence, a two-floor, single-family residence, in Orwell, Ohio. In the indictment for which the warrant was issued, Olsen was charged with illegal manufacture of meth and illegal assembly or possession of chemicals for the manufacture of meth.

2

{¶6}    Deputy Thomas said that upon arrival, the officers went to the back door of the house.  He said that some of the officers on the team were familiar with Olsen's house and knew the back door was used to access the house.  The officers knocked on the door and eventually Olsen came to the door.  They told her they had an arrest warrant for her and arrested her on the warrant.

{¶7}    At that time, Olsen was just wearing underwear.  She told the officers she wanted to get dressed and asked for more clothes before going to jail.  The officers asked her where she kept her clothes.  She said they were in the house.  She said that her four-year-old daughter and appellant were in the house and that appellant could get her the clothes she needed.  Deputy Thomas overheard this conversation.

{¶8}    The rear entrance of the house had an enclosed back porch, i.e., a mudroom, where a washer and dryer were located.  The officers initially knocked at the exterior back door leading to the mudroom and Olsen answered at that door.  There was also an inside door from the mudroom to the kitchen in the main part of the house.

{¶9}    In order to secure the clothes Olsen requested, Deputy Thomas knocked on the inside door.  Appellant came to the door and opened it.  As soon as appellant opened the door, Deputy Thomas immediately recognized the odor of a meth lab coming from inside the house.  This perception was based on his experience being in and processing some 80 meth labs.

{¶10}  As Deputy Thomas stepped in the house, appellant tried to close the door and block him from coming inside.  Appellant was then removed from the house.  After the officers secured and detained him, because Olsen said a child was in the house, the

3

officers' main focus was to find the child and remove her from the house and the danger presented by the meth lab.

{¶11} Deputy Thomas said he found the child asleep in an upstairs bedroom, which was next to a room that he later learned was Olsen's bedroom. While upstairs, Deputy Thomas determined that Olsen's bedroom was the source of the meth-lab odor in the house. Olsen's door was open and as he walked inside, he saw two one-liter pop bottles, each containing a one-pot method meth lab. He also saw other evidence of a meth lab. He saw several cold pack packages, a paddle and a "pestle," i.e., a bowl, used to crush pseudophedrine pills into a powder. The bowl was filled with white powder, which he suspected was crushed pseudophedrine.

{¶12} Each of the two pop bottles had three levels of liquid in them, which Deputy Thomas recognized as meth from his experience cleaning meth labs. He said the tri-level liquid in the bottles consisted of pseudoephedrine, ammonium nitrate pellets extracted from instant cold packs, Coleman fuel, lye, acid, drain cleaner, lithium from lithium batteries, and water. He said that once a few drops of water are added to the lithium, the resulting chemical reaction changes the chemical composition of pseudoephedrine to meth. The chemical reaction starts a swirling effect in the bottle. He said the bottle must be regularly "burped," i.e., opened a little to allow the gasses to escape; otherwise, the gasses will cause the bottle to explode. Burping allows the fumes created in the meth lab to escape and produces the distinctive acidic, fuel-like odor Deputy Thomas detected upon entering the house.

{¶13} Deputy Thomas said that as the officers went upstairs, the meth-lab smell became stronger, and he thus believed the bottles had recently been burped. After

4

discovering the two meth labs, the officers contacted the Orwell Village Police Department and requested a crew be assigned to clean the labs.

{¶14} Appellant testified that at the time of the search, he was living at Olsen's house with her, her daughter, and his father. Appellant said that before he opened the door for the officers, he was not aware of any odors from meth in the house. He said that when he opened the door for Deputy Thomas, he just stood there as the officers came in the house. He said he never tried to close the door on Deputy Thomas. Appellant said that when the officers walked in the house, Deputy Thomas "put his nose in the air and said that there's definitely a lab in here." Appellant said he was then arrested and removed from the house. After being Mirandized, appellant told the officers the meth lab upstairs was his.

{¶15} Appellant testified the officers did not need to come into the main part of the house to get Olsen's clothes because some of her clothes were in the mudroom on top of the washer and dryer.

{¶16} However, on cross-examination, appellant admitted that his clothes and his father's clothes were also in the mudroom. He said the clothes were either on top of the washer and dryer or inside, and admitted that if they were inside the washer and dryer, the officers would not have been able to see them.

{¶17} Appellant conceded that when Deputy Thomas said there was definitely a meth lab in the house, that comment was correct. Appellant also admitted his meth lab was upstairs exactly where Deputy Thomas said it was.

{¶18} Finally, appellant conceded that pop bottles used to manufacture meth must be burped regularly, but said that both labs found in Olsen's bedroom were done

5

cooking. He said they were cooked the night before somewhere outside of Orwell and that he had not burped them since then. He said that after both bottles were cooked, he brought them to Olsen's house and placed them and all the meth components in her bedroom. However, on cross-examination, he admitted that at least one of the bottles still contained meth and was not finished cooking.

**{¶19}** Following the suppression hearing, the court entered judgment on March 8, 2013, overruling the motion to suppress pursuant to the emergency aid doctrine. The court found the officers had authority to search the house without a search warrant due to the risk of explosion presented by the manufacture of meth and the officers' knowledge that a child was in the house based on information provided by Olsen.

**{¶20}** The matter proceeded to jury trial on March 20, 2013, following which appellant was found guilty of illegal manufacture of meth (Count One) and illegal assembly or possession of chemicals for the manufacture of meth (Count Two). The jury made special findings that appellant committed both offenses in the vicinity of a juvenile. Thereafter, the state filed a motion to dismiss Counts Three and Four, which the court granted.

**{¶21}** On May 20, 2013, appellant was sentenced to five years in prison with four years mandatory on Count One, illegal manufacture of meth, a felony of the first degree. The trial court merged Count Two, illegal assembly or possession of chemicals for the manufacture of meth, with Count One for purposes of sentencing.

**{¶22}** Appellant appeals his conviction, asserting two assignments of error. For his first assigned error, appellant contends:

6

{¶23} "The trial court erred in overruling defendant-appellant's motion to suppress in violation of his Fourth, Sixth and Fourteenth Amendment rights."

{¶24} Appellate review of a trial court's ruling on a motion to suppress evidence presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶8. During a hearing on a motion to suppress evidence, the trial court acts as the trier of fact and, as such, it is authorized to resolve factual questions and assess the credibility of witnesses. *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). An appellate court reviewing a ruling on a motion to suppress is bound to accept the trial court's findings of fact where they are supported by competent, credible evidence. *State v. Guysinger*, 86 Ohio App.3d 592, 594 (4th Dist.1993). Accepting these facts as true, the appellate court independently determines, as a matter of law, without deference to the trial court's conclusion, whether the facts meet the applicable legal standard. *State v. Williams*, 86 Ohio App.3d 37, 41 (4th Dist.1993); *State v. Djisheff*, 11th Dist. Trumbull No. 2005-T-0001, 2006-Ohio-6201, ¶19.

{¶25} The Fourth Amendment of the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause * * *."

{¶26} "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980), quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477-478 (1971). The United States Supreme Court has held that "in terms that apply equally to seizures of property and seizures of persons, the Fourth Amendment

7

has drawn a firm line at the entrance to the house." *Id*. at 590. "Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id*.; *see also State v. Howard*, 75 Ohio App.3d 760, 768 (4th Dist.1991); *State v. Martin*, 11th Dist. Portage No. 2002-P-0072, 2004-Ohio-3027, ¶17.

{¶27} Appellant argues the trial court erred in finding that the emergency aid doctrine justified the search in this case.

{¶28} "The exigent circumstances doctrine requires * * * probable cause plus exigent circumstances * * * to effectuate a warrantless entry of a home." *State v. Pape*, 11th Dist. Ashtabula No. 2004-A-0044, 2005-Ohio-4657, ¶19, citing *Kirk v. Louisiana*, 536 U.S. 635, 637 (2002). "Thus, even if the State establishes that probable cause to search the premises existed, this alone is insufficient, absent exigent circumstances, to overcome the strong presumption that a warrantless search or seizure is unconstitutional under the Fourth Amendment. *Martin, supra,* citing *Coolidge, supra*, at 468.

{¶29} Further, in the context of clandestine meth labs, this court in *Pape, supra,* stated that the "'basic aspects of the "exigent circumstances" exception are that (1) law enforcement officers must have reasonable grounds to believe that there is immediate need to protect their lives or others or their property or that of others, (2) the search must not be motivated by an intent to arrest and seize evidence, and (3) there must be some reasonable basis, approaching probable cause, to associate an emergency with the area or place to be searched.'" *Id.* at ¶23, quoting *United States v. Rhiger*, 315 F.3d 1283, 1288 (10th Cir.2003).

{¶30} In *Pape*, this court held that a warrantless search will be upheld "when the odor of chemicals associated with methamphetamine production was detected coming from a residence, the observing officer had extensive knowledge of the particular dangers associated with an active methamphetamine lab, and there was no evidence offered that agents entered the home with an intent to arrest and seize evidence." *Id.* at ¶24.

{¶31} This court decided *Pape, supra*, in 2005. One year later, the General Assembly enacted R.C. 2933.33, effective May 17, 2006, codifying the "emergency aid doctrine," which is the exigent circumstances exception to the search warrant requirement for clandestine meth labs. R.C. 2933.33(A) provides:

{¶32} If a law enforcement officer has probable cause to believe that particular premises are used for the illegal manufacture of methamphetamine, for the purpose of conducting a search of the premises without a warrant, the risk of explosion * * * from the illegal manufacture of methamphetamine * * * constitutes exigent circumstances and reasonable grounds to believe that there is an immediate need to protect the [public].

{¶33} The Ninth District in *State v. White*, 175 Ohio App.3d 302, 2008-Ohio-657 (9th Dist.), *discretionary appeal not allowed by Supreme Court of Ohio at* 118 Ohio St.3d 1508, 2008-Ohio-3369, addressed R.C. 2933.33. In applying this statute, the appellate court stated:

{¶34} [I]in the case of methamphetamine laboratories, if officers have a *reasonable belief*, based upon specific facts discovered prior to

9

entry, that a methamphetamine laboratory is being operated at a particular location, the emergency aid exception applies and the officers may enter the premises in order to protect the public.

{¶35} [T]he exigent circumstance was * * * the danger of fire and explosion presented by the clandestine production of methamphetamine. * * * The officers were justified in entering the house without a warrant under the emergency aid exception to the warrant requirement because this Court has held that operation of a methamphetamine laboratory constitutes an emergency threatening life and limb and the police had obtained sufficient information to create an objectively reasonable belief that a methamphetamine laboratory was being operated at that address. (Emphasis added.) *Id.* at ¶20-21.

{¶36} Thus, if officers have probable cause to believe that a meth lab is being operated on the premises, the risk of explosion constitutes exigent circumstances, authorizing officers under the emergency aid exception to enter the premises without a search warrant in order to protect the public.

{¶37} Appellant concedes that exigent circumstances existed in this case, but argues the search was not justified because the officers did not have probable cause.

{¶38} Appellant argues the officers lacked probable cause because Deputy Thomas' testimony that he detected the odor of a meth lab as soon as appellant opened the door conflicted with the testimony of two other witnesses. First, appellant argues he testified there was no such odor in the house. The trial court obviously found that

Deputy Thomas' testimony on this issue was credible and that appellant's testimony was not. As the trier of fact, the trial court was entitled to make this call.

{¶39} Further, appellant argues that Deputy Steve Murphy, one of the task force officers, did not detect the odor until he entered the house. However, since Deputy Murphy did not testify at the suppression hearing, but only at trial, this argument is unavailing. In any event, Deputy Murphy testified that Deputy Thomas was in front of him. The trial court was thus entitled to find, as it obviously did, that Deputy Thomas was in a better position than Deputy Murphy to immediately detect the odor. In these circumstances, the trial court could logically find there was no conflict between the testimony of the deputies and that any difference resulted from their different positions and did not defeat the existence of probable cause.

{¶40} Here, Deputy Thomas had probable cause to believe that a meth lab was being operated at Olsen's residence. The task force had an arrest warrant for Olsen based on an indictment charging her with meth-related offenses. When she came to the door and the officers told her they had a warrant for her arrest, she asked for clothing. She said that appellant and her child were in the house and that appellant could get her the clothes she needed. Deputy Thomas testified that, as soon as appellant opened the interior door leading to the main part of the house, he immediately detected the odor of a meth lab. This perception was based on the deputy's experience from being present in and processing some 80 meth labs. Deputy Thomas also testified that, due to the violent chemical reaction created by the combination of the various chemicals in one-pot meth labs, such as those involved here, they present a "substantial" risk of explosion.

11

{¶41} We therefore hold the trial court did not err in finding that the warrantless search of Olsen's residence was authorized by the emergency aid doctrine.

{¶42} Appellant's first assignment of error is overruled.

{¶43} For his second and final assigned error, appellant alleges:

{¶44} "The trial court's failure to determine whether the defendant-appellant made a knowing and intelligent decision to waive his right to testify on his own behalf violated his Sixth and Fourteenth Amendment rights."

{¶45} Appellant argues that his constitutional rights were violated when the trial court failed to personally address him and ask him if he understood he had a right to testify and if he knowingly and intelligently waived that right after defense counsel advised the court that the defense would not be calling any witnesses to testify at trial.

{¶46} Appellant concedes that "State Courts have found that a trial court is not required to make this inquiry." Further, appellant cites no federal cases requiring trial courts to make such an inquiry in the context of trial.

{¶47} The Supreme Court of Ohio addressed this issue in *State v. Bey*, 85 Ohio St.3d 487 (1999). In *Bey*, the defendant argued he was denied his due process rights because the trial court failed, sua sponte, to "conduct an inquiry as to whether he knowingly and intelligently waived his right to testify at trial." The Court held that a defendant's right to testify is a fundamental right that is waivable only by an accused. *Id.* at 499. However, the Court noted that Ohio appellate and federal circuit courts have held that neither the United States Constitution nor applicable rules require a trial judge to personally address a defendant about the decision whether to testify at trial. *Id.* The Court noted that such an inquiry is thought to be simply unnecessary. Alternatively, it is

12

considered harmful as such inquiry unduly interferes with the attorney-client relationship and the tactical decision concerning whether the defendant will testify. *Id.*

{¶48} Since the trial court was not required to address appellant to determine if he understood his right to testify and whether he voluntarily waived that right, the court's failure to do so did not constitute error.

{¶49} Appellant's second assignment of error is overruled.

{¶50} For the reasons stated in the opinion of this court, appellant's assignments of error are not well taken. It is the judgment and order of this court that the judgment of the Ashtabula County Court of Common Pleas is affirmed.


DIANE V. GRENDELL, J.,

THOMAS R. WRIGHT, J.,

concur.