[Cite as *State v. Telshaw*, 195 Ohio App.3d 596, 2011-Ohio-3373.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| THE STATE OF OHIO, | ) | CASE NO. 10 MA 56 |
| | ) | |
| APPELLEE, | ) | |
| | ) | |
| V.. | ) | OPINION |
| | ) | |
| TELSHAW, | ) | |
| | ) | |
| APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:    Criminal Appeal from the Court of
                             Common Pleas of Mahoning County, Ohio
Case No. 06 CR 834

JUDGMENT:                    Affirmed.

APPEARANCES:

                             Paul J. Gains, Mahoning County
                             Prosecuting Attorney, and Ralph M.
                             Rivera, Assistant Prosecuting Attorney,
                             for appellee.

:                            The Norton Law Firm Co., L.P.A.,
                             and Eric Norton, for appellant.

JUDGES:

Hon. Cheryl L. Waite
Hon. Joseph J. Vukovich
Hon. Mary DeGenaro

                             Dated:  June 29, 2011


        WAITE, Presiding Judge.

{¶ 1} Appellant, Randall Telshaw, appeals his conviction on one count of possession of chemicals with the intent to manufacture explosives, in violation of R.C. 2909.28(A), a felony of the fourth degree. Appellant contends that the trial court erred when it overruled his motion to suppress evidence of the crime, which was discovered during a warrantless search of his home. Appellant had earlier been shot in his home during an armed robbery, and he called a friend to take care of his house while he was in the hospital. When the friend found the front door open and a bloody sheet on the floor, he called the police to search the home for intruders. During this search, the police found bomb-making materials. The record indicates that appellant's friend had authority to consent to a police search of the house for intruders and that the police were engaged in community-caretaking functions when entering the premises and when they found the bomb-making materials. The record supports the trial court's decision to overrule the motion to suppress, and the judgment of the trial court is hereby affirmed.

Case History

{¶ 2} Appellant was the victim of a home invasion and armed robbery on June 28, 2006. He sustained gunshot wounds to both arms that required hospitalization. While he was hospitalized, police searched his house and found bomb-making materials including explosive chemicals, rockets, and a bazooka. On August 10, 2006, appellant was indicted on a charge of possession of chemicals with intent to manufacture explosives in violation of R.C. 2909.28(A), a fourth-degree felony. Appellant filed a waiver of speedy-trial rights, and after numerous delays,

including substitution of counsel and mental-health assessments, he eventually filed a motion to suppress on July 9, 2009. A hearing was held on August 31, 2009.

**{¶ 3}** At the suppression hearing, appellant's friend Arlie Utsinger testified that appellant asked him to "secure his house, check his house," and "take care of his house" after the shooting incident. Utsinger explained that appellant had valuables that he was concerned about, which he described as "car engines and things that [he] knew about from the machine shop." Utsinger testified that appellant did not ask him to stay at the house but made it clear that he had permission to enter the house, retrieve and look after things on appellant's behalf, and secure the house.

**{¶ 4}** When Utsinger arrived at appellant's residence, the front door was ajar and a bloody sheet was in the doorway. Utsinger called a friend's daughter because he was afraid to enter the house, and she called the police. When the officers arrived, Utsinger explained that the homeowner had been shot there the night before and that he had asked Utsinger to "secure it, lock it up, whatever. That's the gist of it, to look after his stuff." Utsinger testified that the police officers knew that appellant had authorized his entry into the house. According to one of the officers, Utsinger believed that appellant's next-door neighbors had perpetrated the crime and feared that they may have reentered the house after appellant was taken to the hospital. Utsinger asked them to walk through the house to determine whether the individuals that shot appellant had returned. The officers contacted their supervisor, who, after determining that the officers believed that they had ample manpower, authorized their entry into the house.

{¶ 5} On cross-examination, Utsinger testified that he "thought [he] heard something" coming from the house and that he told the officers that he heard a sound. He further testified that he "thought [the officers] did, too." However, Youngstown Police Department Officer David Wilson did not testify that Utsinger told the officers that he had heard any noise coming from the house, and he denied that the officers heard anything. Officer Wilson testified that he believed that Utsinger had authority to consent to the officers' entry into the home "[b]ecause he said it was his friend's house, he was there and there's no other reason for him to be there at this house to check the house out."

{¶ 6} Wilson testified that he and the other officer went from room to room on the first floor, then the second floor, and then the basement, making certain that the windows were closed and looking for signs of forcible entry into the residence. While checking the basement, the officers discovered approximately 20 propane tanks, pipes and tubing, and a number of 55-gallon drums, one of which was labeled "phosphate." The officers recognized the items in the basement as bomb-making materials. The officers retraced their steps out of the house and contacted the bomb squad. The bomb squad then conducted a search of the house.

{¶ 7} The following day, June 30, 2006, a special agent with the Bureau of Alcohol, Tobacco, and Firearms, Kimberly Riddell, was dispatched with two Youngstown police detectives and two Federal Bureau of Investigation agents to the hospital to interview appellant. After appellant was Mirandized, Riddell explained to him that certain materials had been discovered by the police, including "the rockets, the chemicals, the ammonium nitrate, potassium nitrate, methylene chloride,

potassium perchlorate," and inquired as to whether there were any booby traps or explosive devices in the house that might be triggered when the police removed the dangerous materials from the house. Appellant assured Riddell that there were no live devices or bombs in the house, no chemicals had been mixed, and the rockets were inert. He consented to a search of his home and also agreed to allow law-enforcement agents to remove from the house any chemicals or devices that they deemed to be dangerous. Appellant signed a preprinted Youngstown Police Department consent-to-search form.

{¶ 8} When asked the reason that Riddell had requested appellant's consent to search the house after the house had already been searched by the bomb squad, she explained that secondary devices often accompany primary devices and that she had asked appellant whether there were any secondary devices out of safety concerns for the officers and agents who would be removing the primary devices as well as concern for the surrounding neighborhood. She further testified that she believed that she had not needed appellant's consent, because there was sufficient probable cause to search the house.

{¶ 9} The trial court held a hearing on the motion to suppress on August 31, 2009. Although there is no judgment entry overruling the motion to suppress, the parties agree that the court denied the motion and the case then proceeded to jury trial. On January 29, 2010, the jury returned a guilty verdict. On March 4, 2010, the court sentenced appellant to community-control sanctions, fines, court costs, and restitution. This timely appeal followed.

{¶ 10} Appellant argues in his sole assignment of error that there were no exigent circumstances on June 29, 2006, to justify a warrantless search and that Utsinger did not have common authority to consent to a search of appellant's home. Appellant further contends that the materials found in his basement were not incriminating evidence and therefore did not create probable cause to search the rest of the house.

Assignment of Error

{¶ 11} "The trial court erred in denying defendant-appellant's motion to suppress in violation of his constitutional right of protection against warrantless, nonconsensual searches in violation of his rights under Article I, Section 10 of the Ohio Constitution and the Fourth Amendment to the U.S. Constitution."

{¶ 12} The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution secure an individual's right to be free from unreasonable searches and seizures and require warrants to be particular and supported by probable cause. Probable cause for a search warrant exists when a reasonably prudent person would believe that there is a fair probability that the place to be searched contains evidence of a crime. *Illinois v. Gates* (1983), 462 U.S. 213, 238-239, 103 S.Ct. 2317, 76 L.Ed.2d 527. Warrantless entry by law-enforcement personnel into premises in which an individual has a reasonable expectation of privacy is per se unreasonable unless it falls within a recognized exception to the warrant requirement. *Minnesota v. Olson* (1990), 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85.

**{¶ 13}** "Once a warrantless search is established, the burden of persuasion is on the state to show the validity of the search." *Xenia v. Wallace* (1988), 37 Ohio St.3d 216, 218, 524 N.E.2d 889. In considering a motion to suppress, the trial court assumes the role of the trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of the witnesses. *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972. Accordingly, appellate courts are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Guysinger* (1993), 86 Ohio App.3d 592, 594, 621 N.E.2d 726. However, we must determine independently whether the trial court's conclusions of law, based on those findings of fact, are correct. *State v. Klein* (1991), 73 Ohio App.3d 486, 488, 597 N.E.2d 1141.

**{¶ 14}** Law-enforcement agents "bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches and arrests." *Welsh v. Wisconsin* (1984), 466 U.S. 740, 749-750, 104 S.Ct. 2091, 80 L.Ed.2d 732. The state must "demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." Id. at 750. Further, there must be some real, immediate, and serious consequence, if the officer postponed action in order to get a warrant, for the risk-of-harm exigency to apply. *Minnesota v. Olson*.

**{¶ 15}** Evidence that is obtained in violation of the Fourth Amendment will generally be prohibited from trial under the exclusionary rule. "Although the Fourth Amendment does not explicitly provide that violations of its provisions will result in suppression of evidence obtained as a result of the violation, the United States

Supreme Court has held that the exclusion of that evidence is an essential part of the Fourth Amendment." *State v. Jones* (2000), 88 Ohio St.3d 430, 434, 727 N.E.2d 886.

{¶ 16} Consent is a well-recognized exception to the warrant requirement. *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854. Generally, consent to search a person's residence may be obtained from a third party who possesses common authority over, or other sufficient relationship to, the premises. *United States v. Matlock* (1974), 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242. "Common authority" rests on "mutual use of the property by persons generally having joint access or control for most purposes." Id. at 171, fn. 7. The principle of common authority in this context is not derived from property law, and it is generally agreed that a landlord cannot give consent for a general search of a tenant's property, nor can a hotel clerk open customer's room to the police for inspection. Id. Common authority derives from the actual use of the property based on the mutual understanding of the parties, such that each person has "assumed the risk that one of their number might permit the common area to be searched." Id. This rule was extended in *Illinois v. Rodriguez* (1990), 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148, wherein the United States Supreme Court held at paragraph two of the syllabus: "A warrantless entry is valid when based upon the consent of a third party whom the police, at the time of the entry, reasonably believe to possess common authority over the premises, but who in fact does not."

{¶ 17} Appellant cites numerous cases, though no case particularly on point, to demonstrate that Utsinger did not have common authority to consent to a search of

appellant's house. He relies on cases involving loaned cars, employees consenting to searches of employer's property, hotel rooms, and a handyman. The most analogous circumstance, though, is that of a house-sitter, and we are aware of only one case fairly on point in Ohio caselaw. In *State v. Huntington*, 190 Ohio App.3d 711, 2010-Ohio-3922, 944 N.E.2d 240, the defendant had asked a friend, Brad Waltz, to visit his home three days per week to take care of the defendant's cat while she was out of town. Someone else was designated to take care of the cat on the other days of the week. Waltz was given a front door key. When Waltz went to the house, the defendant sent him a message asking him to turn off some lights. Waltz could not find the light switch downstairs and looked upstairs for it. There he found a cat water dish, so he went into the master bathroom to get some water. When he entered the bathroom he found what appeared to be illegal drugs. Waltz came back a few days later and took photographs of the drugs and also found additional drugs on the dining room table. Shortly thereafter he called the Bowling Green Police Department to report what he had seen.

{¶ 18} When the police met Waltz at the house, the second cat-sitter, Farrah Anderson, was there. Anderson contacted the defendant immediately, who then instructed Anderson not to let anyone in the house. Nevertheless, the police officers and Waltz entered the house and found what appeared to be anabolic steroids in the kitchen. The officers then left to obtain a search warrant and confiscated the drugs and other drug paraphernalia. Huntington was charged with one count of permitting drug use. The defendant filed a motion to suppress, which was denied by the trial

court on the grounds that Waltz had sufficient authority over the common areas of the house as a cat-sitter to allow the police to inspect those areas.

{¶ 19} The Sixth District Court of Appeals did not agree with the trial court's view of the case. It found that Waltz did not have any degree of authority over the house simply from being asked to feed the defendant's cats three days each week. Id. at ¶ 22. The Sixth District determined that Waltz had no responsibilities with respect to the house itself, much less the contents of the house, and was not a cotenant, inhabitant, or overnight guest in the house. The court defined Waltz as a cat-sitter and not a house-sitter. Based on this distinction, the court determined that he did not have joint access to the home or "control for most purposes" over the premises. Id. *Huntington* therefore reversed the trial court's ruling and granted the motion to suppress.

{¶ 20} Using *Huntington* as a guide in our analysis, it appears that in the instant case, Utsinger's function is directly analogous to a house-sitter. As such, he had authority to allow police into appellant's house. Utsinger had authority over the entire premises and its contents and was specifically asked to safeguard both. There is no evidence of any limitation on Utsinger's authority over the property and no evidence that appellant had instructed Utsinger not to allow police to help him secure the property if needed. Appellant actually told Utsinger to safeguard the property in the house as well as the house, thus giving him free reign over the entire premises. Furthermore, Utsinger did not ask the police to enter the property to look for evidence that appellant had committed a crime but, rather, to help Utsinger secure the property as he had been directed. Although appellant did not specifically give Utsinger

instructions to reside in the property, it is clear from the record that Utsinger had plenary control over the property to inspect it, examine it, protect it, secure it, and perform whatever function was necessary to safeguard the premises and its contents. Thus, any reasonable police officer would conclude that Utsinger had at least the authority to ask for police assistance in checking the premises for intruders when he found the front door open and a bloody sheet in the doorway, knowing that a crime recently had been committed on the property and that the perpetrators had not yet been apprehended.

{¶ 21} Appellant contends, though, that even if the police were permitted to enter his house to look for intruders, the scope of the search became unconstitutional once the officer found no intruders but decided to call the Youngstown Police Department Bomb Squad to inspect the house without first obtaining a warrant. Appellant contends that there is nothing illegal about pipes, tubing, propane tanks, or the 55-gallon drums. He also submits that a warrantless search was not justified simply because one of the drums was labeled as phosphate. Appellant asks us to take judicial notice of the fact that phosphate is a common chemical used for a wide variety of purposes that have nothing to do with making bombs.

{¶ 22} This argument is advanced for the first time on appeal. It is well established that a constitutional argument, such as a Fourth Amendment search-and-seizure argument, cannot be raised for the first time on appeal. *Howard v. Seidler* (1996), 116 Ohio App.3d 800, 815, 689 N.E.2d 572, citing *State v. Smith* (1991), 61 Ohio St.3d 284, 574 N.E.2d 510. Hence, appellant has waived this argument. Even if the argument had not been waived, it has no merit.

{¶ 23} First, as to the notion that this court can take judicial notice of the uses of phosphate, it would not be appropriate in this case. Pursuant to Evid.R. 201, a court (including an appellate court) may take judicial notice of adjudicative facts at any stage in the proceedings. The only type of facts subject to judicial notice are those not subject to reasonable dispute. Evid.R. 201(B). Even if a fact is capable of being recognized under judicial notice, an appellate court will not take judicial notice if the fact should have been raised with the trial court. "[W]hen a trial court fails to take judicial notice of a factual matter because a party did not raise the issue, an appellate court will not consider the fact in reviewing the appealed judgment. * * * [This] is consistent with the fundamental appellate principle that a reviewing court cannot decide an appeal based upon factual matters which were not before the trial court. In addition, the rule is likewise consistent with the appellate principle that a party will be deemed to have waived any error to which the party failed to object." (Citations omitted.) *Hubbard v. Luchansky* (1995), 102 Ohio App.3d 410, 413-414, 657 N.E.2d 352. In this appeal, appellant would have us take judicial notice not only that phosphate has many common uses but also that these uses are more common than its use as a component in making bombs. Appellant also apparently wants us to take judicial notice that it is common to have a 55-gallon drum of phosphate in one's home. In essence, appellant would like us to rely on new evidence to help us come to a different interpretation of the evidence than the trial court did, and this is an inappropriate use of the principle of judicial notice.

{¶ 24} Second, the scope of the officers' search leading to the discovery and identification of bomb-making materials was appropriate under the police community-

caretaking function to enhance public safety. In fact, the community-caretaking function provides a second justification for the police to enter the house in the first place. The community-caretaking function falls within the category of exigent circumstances, which is a well-recognized and carefully delineated exception to the warrant requirement. *Minnesota v. Olson* (1990), 459 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85; *Welsh*, 466 U.S. at 749, 104 S.Ct. 2091, 80 L.Ed.2d 732.

{¶ 25} The United States Supreme Court has identified four main types of exigent circumstances: hot pursuit of a fleeing felon, imminent destruction of evidence, the need to prevent escape, and the risk of harm to police or others. Id. These are not the only recognized types of exigent circumstances, though. Another subset of the exigent-circumstances category is the emergency-aid exception. In dealing with this exception, "[t]he key issue is whether the officers 'had reasonable grounds to believe that some kind of emergency existed * * *. The officer must be able to point to specific and articulable facts, which, taken with rational inferences from those facts, reasonably warrant intrusion into protected areas.' " *State v. White*, 175 Ohio App.3d 302, 2008-Ohio 657, 886 N.E.2d 904, ¶ 17. "[T]he warrantless entry and search must be limited in duration and scope to the purpose justifying that intrusion, including only that which is necessary to alleviate the emergency and the dangers associated therewith." *State v. McKinley*, 2d Dist. No. 21668, 2007-Ohio-3705, ¶ 15. Under the emergency-aid exception, an officer has both a right and a duty to enter the premises and investigate. *State v. Applegate* (1994), 68 Ohio St. 3d 348, 350, 626 N.E.2d 942.

{¶ 26} The community-caretaking function is closely related to the emergency-aid exception. The community-caretaking-function rationale was first articulated in *Cady v. Dombrowski* (1973), 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706. In that case, the police discovered evidence of a crime in the trunk of a car that was impounded after it was found disabled as a result of an accident on a highway. The owner of the car was intoxicated and, at some point, comatose and could not make arrangements to remove the car from the highway. The *Cady* court reasoned:

{¶ 27} "Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Id. at 441.

{¶ 28} A community-caretaking situation more closely related to the facts of the instant case can be found in *State v. Stanberry*, 11th Dist. No. 2002-L-028, 2003-Ohio-5700. The police officers in *Stanberry* arrived at the defendant's home in response to an emergency call about a possible overdose. When they arrived, rescue workers were questioning Stanberry about the pills he had ingested. When

Stanberry was taken to the hospital, the officers remained at the scene to question a friend of Stanberry who had placed the emergency call, in an effort to determine whether the overdose was intentional. In the event of an intentional overdose, the procedure of the sheriff's department was to notify the hospital in order to arrange a psychiatric evaluation before releasing the patient.

{¶ 29} While the officers were in the living room, they noticed a number of burning candles that had burned down to the point that the wax was dripping onto the floor. Concerned that other candles might be burning on the second floor of the house, the officers performed a sweep of the rooms upstairs to look for burning candles. A glow was emanating from one of the bedroom doors. When the officers opened the bedroom door, they discovered a collection of marijuana plants under grow lights. The police obtained a search warrant, and the plants and other contraband were confiscated, leading to a variety of felony drug charges. Id. at ¶ 22. Stanberry challenged the search and seizure on the grounds that no exigent circumstances existed.

{¶ 30} The *Stanberry* court recognized that police officers may, without reasonable suspicion of criminal activity, intrude on a person's privacy to carry out community-caretaking functions to enhance public safety. Id. at ¶ 23, citing *State v. Norman* (1999), 136 Ohio App.3d 46, 54, 735 N.E.2d 953. The key to such permissible police action, the Eleventh District wrote, is the reasonableness required by the Fourth Amendment. *Stanberry* at ¶ 23.

{¶ 31} The Eleventh District Court of Appeals reviewed the evidence in light of the officers' community caretaking function. The *Stanberry* court concluded that the

initial reason for the entry into the house—the possible drug overdose—did not justify a search of the upstairs. Nevertheless, the initial entry did justify the officers in entering the first floor, and it was there that they encountered a second problem that needed immediate attention, that of the burning candles: "In our view, the police officers were acting reasonably when they performed their search of the home for burning candles. It was not unreasonable for the officers to conclude, after observing the severely melted candles downstairs, that other candles might be lit throughout the house. As such, it was incumbent upon the officers to make a reasonable investigation of appellant's home and extinguish any remaining candles. Of course, during this search the officers came upon appellant's marijuana plants. Although the plants were plainly visible from the doorway, the officers nevertheless secured a search warrant before seizing them. Therefore, the search and ultimate seizure under consideration did not run afoul of the Fourth Amendment's prohibition on unreasonable searches and seizures." Id. at ¶ 23.

{¶ 32} In this appeal, the officers were first called to the appellant's house because Utsinger was afraid to enter the house. Utsinger informed the police that he had authority to secure appellant's house, that appellant had been shot in the house the night before and was in the hospital, that the perpetrator was at large and may have been a neighbor, and that the door was ajar and there was a bloody sheet in the doorway. The officers undertook a community-caretaking function by examining the house for intruders based on the potentially dangerous situation described by Utsinger.

{¶ 33} Further, the *Cady* court implicitly recognized that local police officers frequently engage in citizen contacts in homes and offices. The facts in this case are an example of the kind of citizen contact recognized in *Cady*. See also *United States v. Rohrig* (1996), 98 F.3d 1506 (warrantless entry into a residence to reduce stereo volume found to be reasonable under community-caretaking-functions analysis). Consequently, for this reason, also, the warrantless entry into appellant's home by police officers does not run afoul of the Fourth Amendment.

{¶ 34} It was the search for intruders, rather than a search for anything relating to possible criminal activity by appellant, that led the officers to find what they considered to be bomb-making materials. As in the situation in *Stanberry*, the officers encountered a second community-caretaking duty while they were still within the scope of their initial purpose, which was to search for intruders. Their conclusion that the materials they found were bomb-making materials was based on their reasonable assessment of the situation. Officer Wilson provided the following testimony regarding the material found in the basement:

{¶ 35} "[W]e checked the basement, me and my partner, and as we went in the basement, I noticed a bunch of propane tanks for grills. There were probably about 20 of them there, and I see different size pipes and tubing downstairs, and I seen [sic] some 55-gallon drums down there and I think one of them stated phosphate on it.

{¶ 36} "And my buddy, he was in the service and he was over in the war. I didn't know too much about it, but I told my partner, 'Don't they make bombs out of

this kind of stuff,' and he said, 'Yeah.' And I said, 'Stop what we're doing right now and let's retrace our steps and get out of here right now.' "

{¶ 37} Appellant argues that the officers did not have probable cause to continue searching or to call in outside help to deal with the danger. As the case law dealing with emergency-aid and community-caretaking functions makes clear, though, the officers did not need probable cause to carry out their duties. They needed reasonable belief under the circumstances that an immediate danger may exist to take steps needed to deal with the danger at hand. In any event, the record established not only reasonable suspicion but also probable cause to believe that contraband was in the house in plain view. In *Arizona v. Hicks* (1987), 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347, the United States Supreme Court held that in determining whether the criminal nature of an item is "immediately apparent" for purposes of exempting the item under the plain-view exception, the officers must have probable cause to believe the item is contraband. Id. at 327. "The 'immediately apparent' requirement of the 'plain view' doctrine is satisfied when police have probable cause to associate an object with criminal activity." *State v. Halczyszak* (1986), 25 Ohio St.3d 301, 496 N.E.2d 925, paragraph three of the syllabus.

{¶ 38} Probable cause is a flexible, commonsense standard. *Texas v. Brown* (1983), 460 U.S. 730, 740-744, 103 S.Ct. 1535, 75 L.Ed.2d 502. It merely requires that the facts available to the officer would cause a man of reasonable caution to believe that certain items may be contraband. Id. at 740. Probable cause to associate an object with criminal activity does not require certainty in the minds of police, but instead amounts to "a fair probability" that the object they see is illegal

contraband or evidence of a crime. *State v. George* (1989), 45 Ohio St.3d 325, 544 N.E.2d 640, paragraph one of the syllabus.

**{¶ 39}** Nor does probable cause require a showing that such a belief is absolutely correct or more likely true than false. *State v. Paschal* (Aug. 2, 1996), 2d Dist. No. 15394; citing *Brinegar v. United States* (1949), 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879. In ascertaining whether probable cause exists, police officers may also rely on their specialized knowledge, training, and experience. *Halczyszak*, 25 Ohio St.3d 301, 496 N.E.2d 925, at paragraph four of syllabus. As the court noted in *State v. Paschal*,:

**{¶ 40}** " 'The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.' " Id. at *3, quoting *United States v. Cortez* (1981), 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621.

**{¶ 41}** Thus, even under the probable-cause standard, the record supports the conclusion that the actions taken by the officers were appropriate under the Fourth Amendment. Because appellant's arguments regarding both Utsinger's authority to consent to a police search and the validity of the scope of the search are meritless, we overrule the sole assignment of error in this appeal.

Conclusion

{¶ 42} In summary, the officers entered appellant's home at Utsinger's request due to safety concerns. The warrantless entry was justified by to Utsinger's consent as caretaker of appellant's home while he was in the hospital. It was also justified as part of the officers' community-caretaking function. Appellant did not raise in his motion to suppress any issues regarding the propriety of the scope of the search, including his argument that the materials found by the police were innocuous and did not constitute bomb-making material. His failure to raise this with the trial court results in any error being waived for purposes of this appeal. It is clear from the record, though, that once the bomb-making materials were discovered, the subsequent actions of the police and the police bomb squad were also appropriate as part of the police community-caretaking functions. Therefore, the trial court did not err when it denied appellant's motion to suppress the evidence found in the house. Accordingly, appellant's sole assignment of error is overruled, and the judgment of the trial court is affirmed.

Judgment affirmed.

VUKOVICH and DEGENARO, JJ., concur.