[Cite as *State v. Stanley*, 2014-Ohio-5636.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | ) | CASE NO. 13 MA 159 |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| CHARLES STANLEY, JR. | ) | |
| | ) | |
| DEFENDANT-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS:     Criminal Appeal from the Court of
                             Common Pleas of Mahoning County,
                             Ohio
                             Case No. 12 CR 335A

JUDGMENT:                    Affirmed.

APPEARANCES:

For Plaintiff-Appellee:      Atty. Paul J. Gains
                             Mahoning County Prosecutor
                             Atty. Ralph M. Rivera
                             Assistant Prosecuting Attorney
                             21 West Boardman Street, 6th Floor
                             Youngstown, Ohio 44503

For Defendant-Appellant:     Atty. Pete C. Klimis
                             4126 Youngstown-Poland Road
                             Youngstown, Ohio 44514

JUDGES:

Hon. Cheryl L. Waite
Hon. Gene Donofrio
Hon. Joseph J. Vukovich

                             Dated: December 19, 2014

WAITE, J.

{¶1} Appellant Charles Stanley appeals his conviction for trafficking in cocaine. He was arrested after police officers found bags of cocaine in his bedroom while they were searching houses on Silliman Street in Youngstown following reports of gunfire in the neighborhood. Appellant argues that the police had no search warrant and that there were no exigent circumstances justifying the search. The record reflects that the police were doing a house to house search for victims after they found fresh gunshot holes in various houses on Silliman Street, and they saw the cocaine in plain view in Appellant's room during the house search. There were sufficient emergency circumstances under the "emergency aid" or "community caretaking" exceptions to justify the search, and the trial court properly overruled Appellant's motion to suppress the drug evidence found in his bedroom. The judgment of the trial court is affirmed.

## Case History

{¶2} In the early morning hours of March 25, 2012, Youngstown Police Officers John Fields and George Wallace responded to a report of shots being fired in the 100 block of Silliman Street in Youngstown. The incident was reported by a resident of 138 Silliman Street. Fields observed bullet holes in the front of the house. He walked through the residence looking for possible victims of the shooting and was able to account for all of its residents. Wallace began checking neighboring houses for bullet holes and other evidence of gunfire. He observed recent bullet holes at 126 Silliman, and a resident told him the house had been shot at that night. Wallace did a search of the house for victims and accounted for all the residents.

{¶3} Fields and Wallace saw fresh bullet holes at 132 Silliman. One bullet hole completely penetrated the front door. They knocked at the front door for several minutes without a response. A neighbor indicated that the residents were likely to be home because the car was in the driveway. Fields became concerned that someone inside might be wounded but might not be able to come to the door. Fields observed through the front porch window that a coffee table had been knocked over, and Wallace saw that the television was on. This gave the officers additional concern that someone might be hurt or in danger within the house.

{¶4} Sergeant Steven Schiffhauer called for assistance from the Youngstown Fire Department to help the officers enter 132 Silliman Street. Firefighters arrived and pried open a side window. At that point, the homeowner, Marquail Watkins, opened the front door and stated: "The shit ain't mine." (7/15/13 Supp. Hrg. Tr., p. 19.) Fields told Watkins about the gunfire and Watkins confirmed that he had heard it. He said no one else was present in the home, but Fields believed there might be other people in the house based on Watkins' statement when he opened the door. The officers searched the main floor, and Wallace observed a bullet hole in the kitchen that went into the ceiling. This lead the officers to believe there might be a shooting victim somewhere on the second floor of the house. They proceeded upstairs and found Appellant in a bedroom. They could only see half of the room from the doorway, so they entered to continue the search. Although Appellant stated that there was no one else in the house, they continued searching since Watkins had told them the same thing and was mistaken.

**{¶5}** Inside the bedroom in which Appellant had been found the officers observed clear plastic bags of a substance that looked like crack cocaine sitting on a shelf in an open closet that had no door. Fields immediately recognized it as illegal narcotics. Wallace found several guns as well as heroin under a blanket in another bedroom.

**{¶6}** Appellant was indicted on April 19, 2012, for trafficking in heroin (R.C. 2925.03(A)(2), (C)(6)(e), a second-degree felony) and trafficking in cocaine (R.C. 2925.03(A)(2), (C)(6)(c), a fourth-degree felony). On June 20, 2012, he filed a motion to suppress. A hearing on the motion was held on July 15, 2013, and trial was set to begin immediately after the suppression hearing. Officers Fields and Wallace testified. Appellant presented no evidence at this hearing. The court did not rule at the end of the hearing. Instead, he took the matter under advisement to review the caselaw. The hearing reconvened, and the court partially sustained the motion to suppress. The court announced that the heroin evidence would be suppressed. The prosecutor requested that the court dismiss count two of the indictment since there was no other evidence supporting the heroin charge, and the court agreed. (7/15/13 Change of Plea Hrg. Tr., p. 7.) The prosecutor then announced that a Crim.R. 11 plea agreement had been reached and that Appellant would plead no contest to count one, trafficking in cocaine. The court immediately held a change of plea hearing and accepted the no contest plea. The change of plea journal entry was filed on July 19, 2013. Sentencing took place on September 18, 2013. The court sentenced Appellant to two years of community control sanctions, 60 days of electronically monitored house arrest, a $500 fine, forfeiture of property,

and a license suspension. The sentencing judgment entry was filed on September 23, 2013, and this timely appeal followed.

ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS PERTAINING TO COUNT 1.

{¶7} Appellant argues that the trial court erred in denying the motion to suppress the cocaine evidence. Appellant contends that the police did not have a search warrant to search either 132 Silliman Street or the bedroom he was using at this location, and that there is no exception to the Fourth Amendment prohibition against warrantless searches under the facts of this case. Warrantless searches are "per se unreasonable under the Fourth Amendment - subject only to a few specifically established and well-delineated exceptions." *Coolidge v. New Hampshire*, 403 U.S. 443, 454-455, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). "One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury. 'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal * * *.' " *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006), quoting *Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). "Thus, the emergency aid exception allows officers to enter a dwelling without a warrant and without probable cause when they reasonably believe, based on specific and articulable facts, that [someone] is in need of immediate aid." *State v. Gooden*, 9th Dist. No. 23764, 2008-Ohio-178, ¶6. The case must be viewed through

the eyes of a reasonable and prudent police officer acting in response to an emergency situation. *Id.*, citing *2 LaFave, Search & Seizure*, § 6.6(a), p. 698. "The officer must be able to point to specific and articulable facts, which, taken with rational inferences from those facts, reasonably warrant intrusion into protected areas." *State v. White*, 175 Ohio App.3d 302, 2008-Ohio-657, 886 N.E.2d 904 ¶17 (9th Dist.). "Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." *Michigan v. Fisher*, 558 U.S. 45, 49, 130 S.Ct. 546, 175 L.Ed.2d 410 (2009).

**{¶8}** The state's basis for explaining the constitutional legality of the search is that there were sufficient exigent circumstances of an emergency to overcome the search warrant requirement. The parties agree that the issue in this appeal is whether exigent circumstances existed, here.

**{¶9}** Although the state relies primarily on the emergency aid exception, the more appropriate exception that applies in this case is the closely related community-caretaking function, which refers to police carrying out the basic responsibility of enhancing and protecting public safety. The community-caretaking function was set forth in *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). The circumstances leading to the seizure of evidence in *Cady v. Dombrowski* arose from a single-vehicle automobile accident. The driver of the car was a Chicago police officer. The accident occurred in Wisconsin, and officers determined at the scene of the accident that the driver was drunk and injured. The driver was taken to a hospital and fell into a coma. The car was towed to a private garage and knowing that the driver was a police officer, the police looked for his service revolver but could

not find it. A standard police inventory was made of the contents of the vehicle in an attempt to locate the service revolver. Upon opening the trunk, the police found items covered in fresh blood, and the officer was later charged with murder. In justifying the search of the trunk, the *Cady* court reasoned that the search of the vehicle was to protect the public from someone who might find and use the service revolver that the police believed was somewhere in the vehicle. The court accepted this community-caretaking rationale, particularly since the car was in an open, unguarded private lot, and the driver, who was a police officer, could not help them locate his service revolver because he had been drunk and then was in a coma.

{¶10} A community-caretaking situation more closely related to the facts of the instant case occurred in *State v. Stanberry*, 11th Dist. No. 2002–L–028, 2003-Ohio-5700. In *Stanberry*, police arrived at the defendant's home in response to an emergency call about a possible overdose. When they arrived, rescue workers were questioning Stanberry about the pills he had ingested. Stanberry was taken to the hospital, but officers remained at the home hoping to discover whether the overdose was intentional. They needed this information because their procedure required that they notify the hospital in order to arrange a psychiatric evaluation in the event of an intentional overdose. The officers noticed candles on the first floor that had burned down to the point that wax was dripping onto the floor. They realized that other candles might be burning in other areas of the house, including the second floor, so they checked the other rooms. They saw a glow coming from a second floor bedroom, but when they opened the door, they discovered marijuana plants growing

under a plant lamp. This led to felony drug charges. The defendant challenged the search and seizure on the grounds that no exigent circumstances existed.

**{¶11}** The *Stanberry* Court held that police officers may, without reasonable suspicion of criminal activity, intrude on a person's privacy to carry out community-caretaking functions to enhance public safety. *Id.* at ¶23, citing *State v. Norman*, 136 Ohio App.3d 46, 54, 735 N.E.2d 953 (3d Dist.1999). The key to such permissible police action, the Eleventh District wrote, is the reasonableness required by the Fourth Amendment. *Id.* The community-caretaking function may initially explain why police enter a home, and depending on what occurs there, may further justify exploration of other parts of the home. *Id.* In *Stanberry*, an emergency call led to questioning other persons in the house about the nature of the overdose, which led to the discovery of burning candles, which led to a concern about the candles being a fire hazard. This led to a search of the house for other burning candles, the discovery of a bedroom with a light like a candle glowing in it, and the discovery of marijuana plants. Each step along the way is explained by the need to protect the public.

**{¶12}** We relied on *Stanberry* to justify the search of a home in *State v. Telshaw*, 195 Ohio App.3d 596, 2011-Ohio-3373, 961 N.E.2d 223. Telshaw had been shot in his home during a robbery, and while he was in the hospital he asked a friend to watch and take care of his house. When his friend arrived at the house the next day, the front door was open and a bloody sheet was in the doorway. He thought that the robbers from the previous evening might have re-entered the house, particularly since no one had yet been arrested for the crime. The police were called

to assist, and as they examined each room they found what appeared to be bomb-making supplies and tools in the basement. The police immediately called the bomb squad, and the items were confiscated. Telshaw was then charged with possession of chemicals with the intent to manufacture explosives.

{¶13} He filed a motion to suppress, which was denied, and on appeal he argued that the scope of the search was too broad and that no exigent circumstances justified the search. Citing *Stanberry*, we held that the community-caretaking function allowed the officers to enter the residence upon invitation by the person in charge of caring for the property. The fact that there had been a shooting the night before, with no arrest, and the fact that the front door was ajar with a bloody sheet in the doorway, supported the reasonableness of the police actions. During their search of the home for intruders, they found bomb-making materials, which then added a second layer of community caretaking duties, *i.e.*, the need to protect the home and the people in and around the home from a potential bomb. We concluded that the officers had a "reasonable belief under the circumstances that an immediate danger may exist to take steps needed to deal with the danger at hand." *Telshaw* at ¶37. This was enough to satisfy the requirements of the community-caretaking exception to the warrant requirement.

{¶14} In the instant case, the police were going door to door checking houses after receiving a report of gunfire in the neighborhood of Silliman Street. The danger presented by gunfire or possible gunshot wounds provides one of the clearest examples of the community caretaking function of the police. *See, e.g., State v. Dunn*, 131 Ohio St.3d 325, 2012-Ohio-1008, 964 N.E.2d 1037. They found fresh

bullet holes in a number of houses, including holes at 132 Silliman. Police looked through the windows and suspected something was wrong because the owner's car was in the driveway and the television was on, but no one was answering the door. Marquail Watkins did not answer the door until firefighters had arrived and pried open a window. Then Watkins lied to the police (in their interpretation) when he said that no one else was in the home. The police observed a bullet hole in the ceiling, explaining why they went upstairs to check those rooms for possible victims. They found Appellant in a bedroom, but continued searching because now they knew that Watkins was clearly wrong or was lying when he stated that no one else was in the house. They observed the cocaine in plain view in an open closet in Appellant's bedroom during their visual inspection for possible gunshot victims. Such openly apparent items are subject to seizure by an officer who has a right to be in a position to observe them. *Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968). Thus, each step, from the initial report of gunshots to the discovery of the cocaine, is explained by the community-caretaking function or other related doctrines involving warrantless searches.

{¶15} The record supports the trial court's conclusion that there were exigent circumstances justifying the search of the room that Appellant was using in Mr. Watkins' home, and the evidence of cocaine was found in plain view while the police were engaged in their community-caretaking duties and while providing emergency aid after receiving reports and evidence of gunfire. There is no basis for overturning the trial court's decision regarding Appellant's motion to suppress, and his sole assignment of error is overruled.

Conclusion

{¶16} Appellant has appealed the partial overruling of a motion to suppress in a case involving a charge of trafficking in cocaine. Cocaine evidence was seized as the police were searching a home for possible victims from recent gunshots on Silliman Street in Youngstown. Fresh bullet holes were found in some homes on the street, and the police were searching each home in case there were wounded persons inside. Upon searching 132 Silliman Street, the police found Appellant in an upstairs bedroom and they also found cocaine in plain view in an open closet. Although the police had no warrant to search the property or seize evidence, the emergency aid and community-caretaking exceptions to the warrant requirement apply in this case to justify the search. Appellant's assignment of error is without merit and the judgment of the trial court is affirmed.

Donofrio, J., concurs.

Vukovich, J., concurs.