[Cite as *State v. Kimble*, 2019-Ohio-2934.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-180182 |
| | | TRIAL NO. B-1704865 |
| Plaintiff-Appellant, | : | |
| | | |
| vs. | : | |
| | | *O P I N I O N.* |
| GREGORY KIMBLE, | : | |
| | | |
| Defendant-Appellee. | : | |


Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  July 19, 2019

*Joseph T. Deters,* Hamilton County Prosecuting Attorney, and *Alex Scott Havlin*, Assistant Prosecuting Attorney, for Plaintiff-Appellant,

*Roger W. Kirk*, for Defendant-Appellee.

**CROUSE, Judge.**

{¶1}     In its sole assignment of error, plaintiff-appellant state of Ohio appeals the trial court's decision granting defendant-appellee Gregory Kimble's motion to suppress.  Because we determine that the trial court was correct in its finding that the community-caretaking exception does not apply to the warrantless search under these facts, we affirm.

### Factual Background and Procedural Posture

{¶2}     Gregory Kimble was homeless and looking for a place to stay.  His friend Shanda Cotton told him he could "crash" at her place for $35 per week. Cotton shared a two-bedroom apartment with her 13-month-old son. Her son's bedroom had a crib, twin bed and a closet containing his clothes. Cotton permitted Kimble to sleep on the twin bed in her son's bedroom, and her son slept with her. Kimble moved into the bedroom with several bags and a plastic storage container of his belongings.  However, the record shows that Kimble did not have exclusive use of the room because Cotton would put her son down for naps in the crib when Kimble was not there and would go into the room in the mornings when Kimble was sleeping to get her son's clothes.

{¶3}     Kimble and Cotton got into a disagreement a few days after he arrived. Cotton testified she asked Kimble to move out.  Because Kimble refused to move out, Cotton called the police and informed them that a man, "G," was staying with her and had a warrant for his arrest.  Cotton did not know Kimble's real name but provided a description.

{¶4}     When Officers Schultz and Wells arrived at the apartment building, they saw Kimble outside on the sidewalk and believed he met the description of "G."

They asked for his name and he gave them a false name. Since they were unable to verify his name, they kept asking Kimble for his real name. Kimble eventually told them he stayed in apartment 24 and his roommate could verify his name. Schwartz and Wells went to apartment 24, and Cotton answered the door. She said she did not know "G's" real name, but all his belongings were in the bedroom. The officers asked for permission to search for Kimble's identification, and Cotton consented. Officer Shultz began searching through Kimble's bags and immediately found a court paper with Kimble's identifying information.

{¶5} Cotton then mentioned to the officers that her neighbors believed Kimble was selling drugs because he was meeting people outside the apartment building. With the court paperwork, Officer Schultz verified Kimble's identify and saw that Kimble's open warrant was for a probation violation on a drug-possession case. As seen on Officer Wells's body camera video, Officer Schultz asked Officer Wells, "Do you want to look through other stuff to make sure there's no guns, drugs or craziness? Cause she definitely don't want that in here." Cotton then tells the officers that she has not seen Kimble with drugs or a gun at her apartment. It was at this point that Officers Schultz and Wells began searching through Kimble's bags and his plastic storage container. As he was rummaging through Kimble's plastic storage container, Officer Shultz uncovered a box of bullets. Officer Schultz then stated, "Now I think we're obligated to take a very, very good look, if he's got bullets he's got a gun, right? I would definitely be concerned there's a gun in here, wouldn't you?" Officer Shultz began to search Kimble's other bags for several minutes and eventually located a .357 Smith and Wesson firearm wrapped in black fabric in a closed drawstring bag.

{¶6} Kimble was arrested on the probation violation warrant and was subsequently indicted for having weapons while under a disability for possessing the .357 Smith and Wesson gun. He filed a motion to suppress the gun based on the warrantless search of his belongings. After two hearings, the trial court granted Kimble's motion. The state now appeals.

### *Law and Analysis*

{¶7} "Our review of a trial court's ruling on a motion to suppress presents a mixed question of law and fact. We must accept the trial court's findings of fact if they are supported by competent and credible evidence, but we review de novo the application of the relevant law to those facts." *In re D.G.*, 1st Dist. Hamilton Nos. C-160515, C-160516, C-160517 and C-160518, 2017-Ohio-4261, ¶ 7.

{¶8} The Fourth Amendment to the United States Constitution, and Article I, Section 14, of the Ohio Constitution, prohibit "unreasonable searches and seizures." "Unless an exception applies, warrantless searches are per se unreasonable." *State v. Bacher*, 170 Ohio App.3d 457, 2007-Ohio-727, 867 N.E.2d 864, ¶ 8 (1st Dist.). " 'Once a warrantless search is established, the burden of persuasion is on the state to show the validity of the search.' " *State v. Smith*, 124 Ohio St.3d 163, 2009-Ohio-6426, 920 N.E.2d 949, ¶ 25, quoting *Xenia v. Wallace*, 37 Ohio St.3d 216, 218, 524 N.E.2d 889 (1988). "[T]he prosecution bears the burden of * * * show[ing] by a preponderance of the evidence that, under the totality of the circumstances, the warrantless search comes within one of the defined exceptions to the warrant clause of the Fourth Amendment." *State v. Baker*, 87 Ohio App.3d 186, 192, 621 N.E.2d 1347 (1st Dist.1993).

{¶9} As an initial matter, the trial court found that the consent-to-search exception to the warrant requirement applied to the officers' search of the bedroom because Cotton had mutual use and joint access to the room, and therefore, Kimble assumed the risk that Cotton might permit the area to be searched. *See State v. Pugh*, 2d Dist. Montgomery No. 25223, 2013-Ohio-1238, ¶ 9. Despite the fact that the trial court found the officers to be lawfully in the bedroom, the trial court found, and the state does not dispute, that Cotton did not have common authority or apparent common authority to consent to the search of Kimble's belongings. Because Cotton told the officers that the bags and the plastic storage container belonged to Kimble, there can be no argument that the officers believed that Cotton had common or apparent authority over those closed containers. *See, e.g., State v. Johnson*, 2017-Ohio-5708, 93 N.E.3d 1261, ¶ 23 (7th Dist.) (finding that the officers "were aware that, at a minimum, the black book bag might belong to Johnson, given their testimony that they had arrested him with a black book bag in the past. The officers' familiarity with the bag belies the trial court's conclusion that [the owner of the residence] had either common or apparent authority over the bag.").

{¶10} The only issue the state challenges on appeal is the trial court's finding that the community-caretaking exception to the Fourth Amendment's warrant requirement does not apply under these facts.

{¶11} At the suppression hearing, Officer Schultz testified that he continued to search Kimble's bags because he was concerned that Cotton's child could potentially find a gun or drugs. The body camera video shows that while Cotton mentioned to Officer Schultz that she suspected Kimble of selling drugs outside the

apartment building, she also stated she did not think he had a gun or drugs in her apartment and she had not seen him with a gun or drugs.

{¶12} The United States Supreme Court first addressed the "community-caretaking" exception in *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), and determined that police officers could perform a "caretaking search" of a vehicle. In *Cady*, officers towed a car that was damaged and inoperable after a traffic accident to a privately-owned unsecured garage. Respondent was the driver of the car and a Chicago police officer who was taken to a hospital where he lapsed into a coma. The officers believed that Chicago police officers were required to carry their service revolver at all times. Because they did not find the revolver on the respondent, an officer ended up searching the car for it. He discovered evidence of a murder in the trunk of the car. Both the state courts and the district court found that the search of the trunk for the service revolver was standard police department procedure, "to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands." *Id.* at 443.

{¶13} "The ultimate standard set forth in the Fourth Amendment is reasonableness." *Id.* at 439. In determining whether the search was reasonable, the Court looked at the fact that the police had exercised a form of custody or control over the disabled vehicle by having it towed, and the respondent could not move the car himself as he was in a coma. The Court also considered that the search of the trunk to retrieve the revolver was standard procedure. The Court noted that there was nothing in the record to discredit the searching officer's motive, particularly where the officer had no knowledge about the murder of which there was evidence in the trunk. The Court recognized the distinction between motor vehicles and dwelling

places and concluded that under the circumstances of that case, the search of the trunk for the revolver was reasonable under the Fourth Amendment community-caretaking exception.

{¶14} The Ohio Supreme Court addressed the community-caretaking exception in *State v. Dunn*, 131 Ohio St.3d 325, 2012-Ohio-1008, 964 N.E.2d 1037. In *Dunn,* police received a dispatch that a tow truck driver was driving with a weapon and threatened to kill himself once he arrived at a nearby location. Police located the tow truck and initiated a traffic stop. Dunn told the officers that he had a gun in the glovebox. Officers opened the glovebox and found a loaded gun. Dunn was subsequently indicted for improper handling of a firearm in a motor vehicle. He moved to suppress the gun arguing that the stop violated the Fourth Amendment.

{¶15} The court recognized that the "community caretaking exception" has also been referred to as the "emergency-aid exception" or "exigent-circumstances exception." *Id.* at ¶ 15. It held that "a community-caretaking/emergency aid exception to the Fourth Amendment warrant requirement is necessary to allow police to respond to emergency situations where life or limb is in jeopardy." *Id.* at ¶ 21. The court noted that "[a]n action is 'reasonable' under the Fourth amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.' " (Emphasis in original.) *Id.* at ¶ 19, citing *Brigham City v. Stuart*, 547 U.S. 398, 404, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). The court held that the officers' actions were reasonable under the circumstances because the officers were trying to prevent Dunn from harming himself, and stopping him on the street rather than entering his home was considerably less intrusive. *Id.* at ¶ 23.

{¶16} Ohio courts have upheld the community-caretaking/emergency-aid exception in cases involving warrantless entries into homes. In one case, officers entered a home after a robbery when the house-sitter called concerned that the intruder was still inside after noticing that the door was ajar and a bloody sheet in the doorway. *State v. Telshaw*, 195 Ohio App.3d 596, 2011-Ohio-3373, 961 N.E.2d 223 (7th Dist.). While searching for the intruder, officers found bomb-making materials. They quickly exited and called the bomb squad. The court held that the officers had a reasonable belief under the circumstances that an immediate danger may exist and were justified in taking steps needed to deal with the danger at hand. *Id.* at ¶ 42.

{¶17} In *State v. Stanley*, 7th Dist. Mahoning No. 13MA159, 2014-Ohio-5636, officers had responded to a shots-fired call, and were going house to house looking for victims. At Stanley's house, they observed fresh bullet holes in the house, there was no answer at the door even though cars were in the driveway, and officers could see through a window from the front porch that the television was on and a table was overturned. As the fire department was trying to pry open a window, an occupant opened the door and immediately said, "The shit ain't mine." The occupant acknowledged that he heard the gun shots, but denied anyone else was present in the home. Based on the conflicting information, the officers entered and followed a bullet hole in the ceiling up to the second floor where they found another occupant as well as drugs and guns. The court held the danger presented by gunfire or possible gunshot wounds provides one of the clearest examples of the community-caretaking function of the police. *Id.* at ¶ 14.

{¶18} In Kimble's case, we are not dealing with a search of a car or a house, but rather with the search of closed containers—Kimble's bags and plastic storage container—in a bedroom where he slept. While the officers were lawfully in the bedroom due to Cotton's consent, they did not have consent to search Kimble's belongings. The issue in this case is whether it was objectively reasonable for the officers to search Kimble's belongings in the bedroom without a warrant. We hold that it was not, because we decline to extend the community-caretaking exception to the facts of this case.

{¶19} Unlike the cases involving a car accident, threatened suicide, an unsecured home after a robbery, or a drive-by shooting, there was no imminent injury and no actual emergency situation. Here, there was merely speculation about the existence of a gun and drugs and even more speculation about the potential gun and drugs causing death or harm. Furthermore, the scope of the exception must be "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *State v. Bacher*, 170 Ohio App.3d 457, 2007-Ohio-727, 867 N.E.2d 864, ¶ 14 (1st Dist.), citing *Cady*, 413 U.S. at 441, 93 S.Ct. 2523, 37 L.Ed.2d 706. In this case, the officers were investigating Kimble for an open warrant on a drug offense. They had just been told that Cotton suspected Kimble was selling drugs outside her apartment. Thus, this was not a search that was totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

{¶20} Law enforcement agents bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches and arrests. *Welsh v. Wisconsin,* 466 U.S. 740, 749-750, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984).

In this case, the officers' actions were not reasonable as they were based on assumptions and speculation, there was no imminent harm, and their actions were not totally divorced from the detection, investigation, or acquisition of evidence.

{¶21} For the foregoing reasons, the state's sole assignment of error is overruled and the judgment of the trial court is affirmed.

Judgment affirmed.

**MOCK, P.J.,** and **MYERS, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.